STATE *ex rel.* GEORGE COUPER GIBBS, Attorney General, v. FRANK V. B. COUCH, *et al.*

190 So. 723
En Banc
Opinion Filed July 19, 1939
Rehearing Denied Aug. 11, 1939

*George Couper Gibbs,* Attorney General, *H. E. Carter,* Assistant Attorney General, *C. L. Waller,* and *Philip D. Beall,* for Relator;

*B. F. Brass* and *Green & West, Mitchell D. Price & Charles W. Zaring,* for Respondents.

BUFORD, J.—This is an original proceeding in quo warranto filed by the Attorney General challenging the authority of the City Commissioners of the City of Daytona Beach prior to the enactment of House Bill No. 1974 at the regular session of 1939 of the Florida Legislature, to continue to hold office and exercise the duties and privileges thereof after House Bill No. 1974, *supra,* had become effective and a new City Commission had been appointed by the Governor, pursuant to the provisions of the said Act.

The case is before us on motion to quash the rule nisi heretofore issued and on motion to strike, which we will

consider as demurrer to the answer filed by certain of the Commissioners along with motion to quash.

The major questions are presented. The first is, whether or not the legislative Act was passed and adopted by the Legislature in compliance with the provisions of Section 21, Article III, of the Constitution of Florida, as amended at the general election in 1938.

The second question is, whether or not the Legislature had the power to enact the provisions included in the bill.

The pertinent part of Section 21, Article III, of the Constitution as amended, is:

"In all cases enumerated in the preceding Section, all laws shall be general and of uniform operation throughout the State, but in all cases not enumerated or excepted in that Section, the Legislature may pass special or local laws, except as now or hereafter otherwise provided in the Constitution; PROVIDED that no local or special bill shall be passed, nor shall any local or special law establishing or abolishing municipalities, or providing for their government, jurisdiction and powers, or altering or amendng the same, be passed unless notice of intention to apply therefor shall have been published in the manner provided by law where the matter or thing to be affected may be situated, which notice shall be published in the manner provided by law at least thirty days prior to introduction into the Legislature of any such bill. The evidence that such notice has been published shall be established in the Legislature before such bill shall be passed, and such evidence shall be filed or preserved with the bill in the office of the Secretary of State in such manner as the Legislature shall provide, and the fact that such notice was established in the Legislature shall in every case be recited upon the Journals of the Senate and of the House of Representatives."

The contention is that the Senate Journal did not sufficiently recite the fact that the required notice was established in the Legislature.

The Journal of the House of Representatives of May 30, 1939, on page 4, shows the following:

"INTRODUCTION OF HOUSE BILLS AND JOINT RESOLUTIONS

"By Messrs. Henderson and Gillespie of Volusia—

"House Bill No. 1974:

"A bill to be entitled An Act to abolish the present municipality of the City of Daytona Beach, in the County of Volusia and State of Florida, and to create, establish, organize a municipality to be known and designated as the City of Daytona Beach in Volusia County, State of Florida. To define its territorial boundaries and to provide for its government, jurisdiction, powers, franchises and privileges; and to provide for the appointment by the Governor of the first members of the City Commission.

"Which bill was read the first time by its title and had attached to same when introduced in the House of Representatives, the following proof of publication, which was ordered to be entered in full upon the Journal of the House of Representatives:

"AFFIDAVIT OF PROOF OF PUBLICATION

"STATE OF FLORIDA,

"COUNTY OF VOLUSIA.

"Before me, the undersigned authority, personally appeared G. P. Weisiger, who, on oath does solemnly swear that he has knowledge of the matters stated herein; that a notice stating the substance of a contemplated law or proposed bill relating to; the abolition of the present municipality of the City of Daytona Beach, in the County of Volusia and State of Florida, and to create, establish and organize a municipality to be known and designated as The

City of Daytona Beach in Volusia County, State of Florida; to define its territorial boundaries; to provide for its government, jurisdiction powers, franchises, privileges; and to provide for the appointment of the first members of the City Commission, has been published at least thirty (30) days prior to this date by being printed in the issue of April 18, 1939, of the Daytona Beach Sun Record, a newspaper published in Volusia County, Florida, where the matter to be affected by the contemplated law is situate; that a copy of the notice that has been published, as aforesaid, and also his affidavit of proof of publication are attached to the proposed bill or contemplated law, and such copy of the notice so attached is by reference made a part of this affidavit.

"G. P. Weisinger.

"Sworn to and subscribed before me this 18th day of April, A. D. 1939.

"(SEAL)

"MARTHA JONES,

"Notary Public, State of Florida at Large. My Commission expires Dec. 17, 1941.

"And the House of Representatives thereupon determined that the notice and evidence thereof required by Section 21 of Article III of the Constitution, has been established in this Legislature. House Bill No. 1974 was placed on the Calendar of Local Bills on second reading without reference."

The House Journal shows the lawful passage of the bill. The Senate Journal of May 31, 1939, on page 9, shows House Messages transmitted to the Senate including House Bill 1974, in the following language:

"The following Message from the House of Representatives was received and read:

"Tallahassee, Florida, May 31, 1939

"Hon. J. Turner Butler,

"President of the Senate.

"Sir:

"I am directed by the House of Representatives to inform the Senate that the House of Representatives has passed: By Messrs. Henderson and Gillespie of Volusia—

"House Bill No. 1974

"A bill to be entitled an Act to abolish the present municipality of the City of Daytona Beach, in the County of Volusia and State of Florida, and to create, establish and organize a municipality to be known and designated as the City of Daytona Beach, in Volusia County, State of Florida, to define its territorial boundaries and to provide for its government, jurisdiction, powers, franchises and privileges; and to provide for the appointment by the Governor of the first members of the City Commission.

*"PROOF OF PUBLICATION ATTACHED.*

"And respectfully requests the concurrence of the Senate therein.

"Very Respectfully,

"BEN H. FUQUA,

"Chief Clerk, House of Representatives."

(Emphasis supplied.)

The Senate Journal shows that House Bill No. 1974 contained in the above stated message from the House was passed. The House Journal of May 31, pages 34 and 35, contains the following:

"MESSAGES FROM THE SENATE

"The following message from the Senate was received and read:

"Senate Chamber
"Tallahassee, Fla., May 31, 1939

"Hon. G. Pierce Wood,
"Speaker of the House of Representatives,
"Sir:

"I am directed by the Senate to inform the House of Representatives that the Senate has passed:

"House Bill No. 1974:

"A bill to be entitled an Act to abolish the present municipality of the City of Daytona Beach, in the County of Volusia and State of Florida, and to create, establish, organize a municipality to be known and designated as The City of Daytona Beach in Volusia County, State of Florida. To define its government, jurisdiction powers, franchises and privileges; and to provide for the appointment by the Governor of the first members of the City Commission.

"Proof of publication attached.

"Very respectfully,
"Robt. W. Davis
"Secretary of State.

"And House Bill No. 1974, contained in the above message, was read the first time by its title and was referred to the Committee on Enrolled Bills."

The records show that the bill was signed by the officers of the House of Representatives and of the Senate, was transmitted to the Governor and was transmitted by him to the office of the Secretary of State without his approval. The bill as filed in the office of the Secretary of State, of which this and other Courts take judicial cognizance, had attached thereto proof of publication sufficient to comply with the provisions of Section 21 of Article III, *supra.*

Such proof of publication is by affidavit as hereinbefore quoted from the House Journal.

We hold that the entries on the Senate Journal are sufficient to show that proof of publication of notice as required by Section 21, Article III, was established in the Legislature and that the language appearing on the Senate Journals "Proof of publication attached" is sufficient to identify the proof of publication of notice as attached to the bill when it was filed in the office of the Secretary of State as the proof of publication of notice which was before the Senate when the bill was received from the House, and that the same was transmitted back to the House attached to the bill when the bill was returned to the House with Senate Messages.

We hold that this was substantial compliance with the constitutional requirement in this regard.

A number of contentions are urged by the respondents within the purview of the second major question hereinbefore stated. We shall not attempt to take up these subquestions in the order in which they are presented but will discuss those features only which we consider expedient to be discussed to be in the disposition of this case.

It is contended that House Bill 1974, *supra,* did not abolish the formerly existing municipality of "The City of Daytona Beach" and that therefore the title to the Act is misleading and that the provisions of the bill are not within the purview of the title. The title to the Act has been quoted hereinbefore from the House Journal.

Sections 1-A and 1-B of the Act are as follows:

"Section 1-A. The Legislature of the State of Florida does hereby find and declare that an emergency and a critical and serious condition exist in the City of Daytona Beach

which require immediate legislative action to protect the welfare of said city and its citizens and their property.

"Section 1-B. That the present municipality of the City of Daytona Beach in Volusia County, State of Florida, be and the same is hereby abolished."

If the Act had stopped with these two paragraphs it would have constituted an effectual abolishment of the formerly existing municipal government of the City of Daytona Beach. The legislature may establish or it may abolish an organized municipal government; or it may abolish an existing municipal government and establish in lieu thereof a like or different municipal government covering the same territory. So, when by the first two paragraphs of the Act, the Legislature abolished the municipal government of the City of Daytona Beach as it theretofore existed, it was competent for the Legislature in the same Act to establish a new municipal government covering the same or different territory, with powers as were enjoyed by the abolished municipality, or with different powers, or in other words, just as if no municipality had theretofore existed covering that territory. The Legislative fiat declaring the municipal government to be abolished is all that is necessary to constitute the abolition.

The municipality is established by Legislative enactment (Sec. 8, Article 8, Constitution) and the law recognizes no such thing as a vested right in municipal office-holders to continue in office when the Legislature has acted so as to cut off the term of office of municipal office-holders. See Booten v. Pimson, 77 W. Va. 412, 89 S. E. 985.

We have followed the above enunciation of the case of City of Jacksonville v. Smoot, 83 Fla. 575, 92 Sou. 617.

In Metropolitan R. Co. v. District of Columbia, 132 U. S. 19, it is held:

"The mode of appointing its officers does not abrogate its character as a municipal body politic. We do not suppose that it is necessary to a municipal government, or to municipal responsibility that the officers should be elected by the people. Local self-government is undoubtedly desirable where there are not forcible reasons against its exercise. But it is not required by any inexorable principle. All municipal governments are but agencies of the superior power of the state or government by which they are constituted and are invested with only such subordinate powers of local legislation and control as the superior Legislature sees fit to confer upon them. The form of those agencies and the mode of appointing officials to execute them are matters of legislative discretion. Commissioners are not unfrequently appointed by the legislature or executive of a state for the administration of municipal affairs, or some portion thereof, sometimes temporarily, sometimes permanently. It may be demanded by motives of expediency or the exigencies of the situation, —by the boldness of corruption, the absence of public order and security, or the necessity of high executive ability in dealing with particular populations. Such unusual constitutions do not release the people from the duty of obedience or from taxation, or the municipal body from those liabilities to which such bodies are ordinarily subject. Protection of life and property are enjoyed, perhaps, in greater degree than they could be, in such cases, under elective magistracies; and the government of the whole people is preserved in the legislative representation of the state or general government. 'Nor can it in principle,' said Mr. Justice HUNT in the Barnes case, 'be of the slightest consequence by what means these several officers are placed in their position,—Whether they are elected by the people of the municipality or appointed by the President or a Governor.

The people are the recognized source of all authority, state and municipal, and to this authority it must come at last, whether immediately or by a circuitous process.' Barnes v. District of Columbia, 91 U. S. 540, 545."

In Barnes v. District of Columbia, 23 L. Ed. 440, 91 U. S 540, it was said:

"A municipal corporation in the exercise of all its duties, including those most strictly local or internal, is but a department of the State. The Legislature may give it all the powers such a being is capable of receiving, making it a miniature state within its locality. Again, it may strip it of every power, leaving it a corporation in name only; and it may create and recreate these changes as often as it chooses, or it may itself exercise directly within the locality any or all the powers usually committed to a municipality. We do not regard its acts as sometimes those of an agency of the State, and at others those of a municipality; but that, its character and nature remaining at all times the same, it is great or small according as the Legislature shall extend or contract the sphere of its action."

In cases of this sort there is no interim of time between the abolition of the old and the establishment of the new municipal government. The abolition of the old and the establishment of the new occur simultaneously upon the legislative Act becoming effective. The attributes of government continue uninterrupted, though the manner of exercising and the extent of the exercise of such attributes may be changed. There is no contractual relation between the State and the municipality growing out of the charter Act which precludes a legislative change in the charter Act.

In the case of Attorney General of the State of Michigan *ex rel.* Kies v. Lowrey, 199 U. S. 233, 26 Sup. Ct. 27, 50 L. Td. 167, it was said:

"Plaintiff in error broadened in this Court his objections to the Act, based on the Constitution of the United States. He urges, besides the contract clause of the Constitution, that provision of the 14th Amendment which protects private property from deprivation without due process of law and Section 4, Article IV, which provides: 'The United States shall guarantee to every State in this Union a Republican form of government.' But the grounds all depend ultimately upon the same arguments. If the legislature of the State has the power to create and alter school districts and divide and apportion the property of such district, no contract can arise, no property of a district can be said to be taken, and the action of the Legislature is compatible with a Republican form of government even if it be admitted that Section 4, Article IV of the Constitution, applies to the creation of, or the powers or rights of property of, the subordinate municipalities of the State. We may omit, therefore, that section and article from further consideration. The decision of the other grounds urged we may rest upon the opinion of the supreme court of the State and the case of *Lamarie County* v. *Albany County,* 92 U. S. 307, 23 L. Ed. 552. It is there said in many ways, with citation of many supporting cases, that the Legislature of the State has absolute power to make and change subordinate municipalities. The following quotation meets exactly the contention of plaintiff in error;

"'Institutions of the kind, whether called counties or towns, are the auxiliaries of the State in the important business of municipal 'rule, and cannot have the least pretension to sustain their privileges or their existence upon anything like a contract between them and the Legislature of the State, because there is not, and cannot be, any reciprocity of stipulation, and their objects and duties are utterly in-

compatible with everything of the nature of compact. Instead of that, the constant practice is to divide large counties and towns and to consolidate small ones, to meet the wishes of the residents, or to promote the public interests as understood by those who control the action of the Legislature. Opposition is sometimes manifested, but it is everywhere acknowledged that the Legislature possesses the power to divide counties and towns at their pleasure, and to apportion the common property and the common burdens in such manner as to them may seem reasonable and equitable.' "

In the case of State of Florida *ex rel.* Johnson v. Goodgame, *et al.,* 91 Fla. 871, 108 Sou. 836, we held:

"It was within the province of the Legislature under the provision of Section 8, Article VIII of the Constitution to abolish either or all of the abolished municipal corporations, but when doing so the Legislature was bound to provide for the protection of the creditors of such corporation. This might have been done by providing for the continuation of the assessment and collection of taxes and the disbursement of funds by proper officials named for that purpose, without the continuation of any corporate existence or the legislature might have done just as it did in this case, that is, provided for the protection of creditors by the creation of a new corporation and the creation of which had the legal effect of establishing a successor entitled to all the rights and responsible for all the liabilities of the abolished corporation."

"Where the Legislature of a State has given a local community, living within designated boundaries, a municipal organization, and by subsequent Act or series of Acts repeals its charter and dissolves the corporation and incorporates substantially the same people as a municipal body under a new name for the same general purpose, and the

great mass of the taxable property of the old corporation is included within the limits of the new, and the property of the old corporation used for the public purposes is transferred without consideration to the new corporation for the same public uses, the latter is the successor in law of the former and liable for its debts."

So it is that it cannot be successfully questioned that the Legislature may abolish a municipal government and in the same legislative Act establish a municipal government like or unlike the former government covering the same or different territory.

It is contended that by Section 3 of the Act which provides as follows: "That the title, rights, ownership of property, uncollected taxes, dues, claims, judgments, decrees and choses in action held and owned by the municipality of the City of Daytona Beach, County of Volusia, State of Florida, shall pass to and be vested in the municipal corporation hereby created and established to succeed the municipality hereby abolished"; property rights or the former rights of the former municipality as to property which it held in its proprietary capacity are invaded.

"The effect of the abolishing of the old municipality and establishing of the new would have been the same in this regard, had this provision not appeared in the Act.

In State *ex rel.* Johnson v. Goodgame, *supra,* we held: "If a municipal corporation goes out of existence by being annexed to or merged in another corporation and if no legislative provision is made respecting the property and liabilities of the corporation which ceases to exist, *the corporation to which it is annexed, or in which it is merged, is entitled to all its property and is answerable for all its liabilities.*

"Where a municipal corporation or public corporation is

*legislated out of existence and its territory annexed to other corporations,* the latter, unless the Legislature otherwise provided, are *entitled to its property,* and severally liable for a proportionate share of its then subsisting legal debts, and vested with the power to raise revenue wherewith to pay them by levying taxes upon the property transferred and the persons residing therein."

In the case of City of Orlando v. Evans, *et al.,* 132 Fla. 609, 182 Sou. 265, we said:

"Section 8 of Article VIII of the Constitution of Florida gave the Legislature of Florida power to establish and to abolish municipalities, to provide for their government, prescribe their jurisdiction and powers, and to alter or amend the same at any time. This Court in many cases has recognized this grant of power to the Legislature. See Hayes v. Walker, 54 Fla. 163, 44 So. 747; State v. Tampa Waterworks Co., 56 Fla. 858. 47 So. 358; City of Tampa v. Prince, 63 Fla. 387, 58 So. 542; Merrell v. City of St. Petersburg, 64 Fla. 367, 60 So. 349; City of Jacksonville v. Bowden, 67 Fla. 18, 64 So. 769; L. R. A. 1916D 1913; Attorney General v. Connors, 27 Fla. 329, 9 So. 7; State v. Dillon, 32 Fla. 545, 14 So. 383; City of Tampa v. Tampa Waterworks Co., 45 Fla. 600, 34 So. 631-639.

"The Constitution of Florida authorizes the Legislature of Florida to pass special laws conferring powers upon municipalities. Hardee v. Brown, 56 Fla. 377, 47 So. 834; Ferguson v. McDonald, 66 Fla. 494, 63 So. 915.

"Where there is a conflict between the general law and special charter provisions included in a legislative Act, it is well settled that the special charter provisions will prevail. See Broward v. Garrison Inv. Corp., 121 Fla. 45, 163 So. 212; City of Apalachicola v. State, 93 Fla. 921; 112 So. 628; Wade v. City of Jacksonville, 113 Fla. 718, 152 So.

197; *Ex Parte* Perry, 71 Fla. 250, 71 So. 174; State v. City of Miami, 101 Fla. 292, 134 So. 608; Saunders v. Howell, 73 Fla. 563, 74 So. 803; Ferguson v. McDonald, 66 Fla. 494, 63 So. 915; State *ex rel.* Dofnos Corporation v. Lehman, 100 Fla. 1401, 131 So. 33.

"Counsel for appellant contends that Chapters 9861 and 10968, *supra,* are each unconstitutional and void: (a) because the Legislature could not interfere with the administrative control of utilities plants; (b) that Legislature could not create a self-perpetuating administrative board to supersede the City of Orlando in the management and control of the plants. It appears that this Court, in the case of State *ex rel.* Johnson v. Johns, 92 Fla. 187, text 194, 109 So. 228, gave full and complete answer to the objection last made when it said:

" 'The principle of local self-government is predicated upon the theory that the citizens of each municipality or governmental subdivision of a State should determine their own local public regulations and select their own local officials; but the extent to which and the manner in which the principle may be made applicable, depends upon the provisions of controlling organic and statutory laws of the particular State. See Mayor, etc., of City of Americus v. Perry, 114 Ga. 871, 40 S. E. Rep. 1004, 57 L. R. A. 230, 6 R. C. L. 23, 21 Fla. 280; 44 Ohio State 348, 89 S. W. 985. The Legislature has plenary power over municipalities except as restrained by the Constitution. Sec. 8, Article VIII, Const. Municipal officers are statutory officers, subject to legislative action; and the right to vote in municipal elections is controlled by statute and not by organic provisions relating to State elections. See State *ex rel.* Attorney General v. Dillon, 32 Fla. 545, 14 South. Rep. 383. Municipal corporations have, in the absence of constitutional pro-

visions safeguarding it to them, no inherent right of self-government which is beyond the legislative control of the State. 262 U. S. 182, 43 Sup. Ct. Rep. 534; 29 A. L. R. 1471; 55 L. R. A. 740; 48 L. R. A. 465; 50 L. R. A. 330; 1 Dillon Munic. Corp. (5th Ed.) Sec. 98.'

"The first objection as to the constitutionality of the Acts, *supra*, is answered by the authority of Hamler v. City of Jacksonville, 97 Fla. 807, 122 So. 220. See State *ex rel.* Landis v. Dyer, 109 Fla. 33, 148 So. 201; Loeb v. City of Jacksonville, 101 Fla. 429, 134 So. 205, 79 A. L. R. 459.

"We therefore hold that the Legislature of Florida had the power to enact Chapters 9861 and 10968, *supra*, and that they are constitutional and supersede Sections 3058, 3059 and 3062 C. G. L., *supra*, insofar as they appertain to the electric light and water plants of the City of Orlando."

Section 27 of the Act, *inter alia*, provides:

"CREATION OF COMMISSION.—There is hereby created a City Commission to consist of five (5) Commissioners who shall be qualified electors in said City and of the zone from which they are elected and who shall be free holders in said City. The first Commissioners elected under the provisions of this charter shall take office on the first Monday in October, A. D. 1940, after their election provided under this charter, and shall hold office for two (2) years thereafter, or until their successors are elected and qualified under the provisions of this charter.

"Upon this charter becoming a law the Governor of the State of Florida be, and he is hereby authorized and empowered to appoint the first City Commission for the City of Daytona Beach, Florida, consisting of seven (7) persons possessing the qualifications to hold the office of a City Commissioner as defined in this chapter, one of whom shall be appointed from Zone Number 1, one of whom shall be ap-

pointed from Zone Number 2, one of whom shall be appointed from Zone Number 3 and one of whom shall be appointed from Zone Number 4 and one of whom shall be appointed from Zone Number 5 and two (2) of whom shall be appointed from the City at Large.

"One of the persons appointed by the Governor as Commissioner at Large shall be named by the Governor as Mayor Commissioner for said city and he shall hold that office of Mayor-Commissioner until the first Monday in October, A. D. 1940, at which time the five (5) Commissioners elected at the regular municipal election in 1940, representing each of the five (5) Zones created and established by this Charter shall take office."

It is contended that this provision is void because it ousts the former officers, Commissioners of the old municipality, City of Daytona Beach, from the offices to which they had been elected and provides for the appointment by the Governor of a City Commission which Commission has the power of levying and causing to be collected taxes against the property and against citizens within the corporate limits and places municipal property held in proprietary capacity in the hands of those officers, who have not been elected by the people. The respondents have presented some authority which would appear to support their contention, but the vast weight of authority is to the contrary.

In Barnes v. District of Columbia, *supra,* the Supreme Court of the United States said:

"An elected mayor or an appointed mayor derives his authority to act from the same source, to-wit: that of the Legislature. The whole municipal authority emanates from the Legislature. Its legislative charter indicates its extent, and regulates the distribution of its powers as well as the manner of selecting and compensating its agents. The

Judges of the Supreme Court of a State may be appointed by the Governor with the consent of the Senate, or they may be elected by the people. But the powers and duties of the Judges are not affected by the manner of their selection. The mayor of a city may be elected by the people or he may be appointed by the Governor with the consent of the Senate; but the slightest reflection will show that the powers of this officer, his position as the chief agent and representative of the City, are the same under either mode of appointment. Whether his act in a case in question is the act of and binding on the city depends upon his powers under the charter to act for the city, and whether he has acted in pursuance of them, not at all upon the manner of his election. It is equally unimportant from what source he receives compensation, or whether he serves without it."

Our Constitution recognizes the propriety of executive appointment of officers. Section 27, Article III, provides. "The Legislature shall provide for the election by the people or appointment by the Governor of all State and county officers not otherwise provided for by this Constitution, and fix by law their duties and compensation."

While this section of the Constitution does not apply to municipal officers, it recognizes the propriety of executive appointment as well as election by the people of public officers. There is nothing in our Constitution which precludes the legislature from providing the appointment of any municipal officers by the Governor.

Unless otherwise provided, the term of all municipal officers would cease when the municipal government is abolished by legislative Act.

The question before us is, whether or not the Legislature had power to enact the law under consideration, and this question must be answered in the affirmative.

Whether or not the legislation is wise and salutary or is foolish and calculated to work hardship are such questions as the Legislature only is required to answer. The legislative determination in this regard cannot be reviewed by the courts. See State. *ex rel.* Vars v. Knott, 135 Fla. 206, 184 So. 752; State *ex rel.* Landis v. Town of Lake Placid, 117 Fla. 874, 158 Sou. 497.

It is further contended that if the Act is valid it has not yet become effective.

Section 18, Article III of our Constitution provides: "No law shall take effect until sixty days from the final adjournment of the session of the Legislature at which it may have been enacted, unless otherwise specially provided in such law."

Section 186 of the Act provides: "This Act shall take effect immediately upon its passage and approval by the Governor of the State of Florida, or become a law without such approval."

The record shows that the Act was not approved by the Governor, but that he allowed the same to become law without his approval and that as such it was filed in the office of the Secretary of State.

In Thompson v. State, 56 Fla. 107, 47 Sou. 816, this Court said: "It appears that when the Legislature intends a law to take effect without reference to approval by the Governor, it provides as was done in Chapters 5636, 5638, Acts of 1907, that 'this Act shall take effect immediately on becoming a law'; or that 'this Act shall take effect immediately,' as in Chapter 5637, Acts of 1907. See also Chapters 5596, 5603, 5608, 5609, 5611, 5615, 5626, Acts of 1907, and Chapters 4972, Acts of 1901."

The language in the present Act provided for two con-

tingencies under either one of which the law should become immediately effective. The first was, that in the event it should be approved by the Governor, and the other was, that it should become a law without his approval. The second condition was met.

Therefore, it is not necessary for us to look to any other provision of the Act to determine when the Legislature intended for it to become effective.

There is some ambiguity in Section 27 of the Act hereinbefore quoted, but it appears to us that the reasonable construction of the section when taken as a whole is that after the election in October, 1940, the Commission should be composed of five (5) members, one from each of the respective zones, but until that time the City should be governed by a Board of seven (7) Commissioners appointed by the Governor; one of such Commissioners to be appointed from each of the five (5) zones and two (2) to be appointed from the city at large.

What may have been the motive prompting this provision is a matter with which the courts are not concerned and, therefore, it is not needful for us to advance any theory which may have prompted it.

We have considered the questions which have been presented to us in the briefs and in oral argument and we find no basis in the record upon which to hold the Act is unconstitutional and void.

The motion to quash is denied.

TERRELL, C. J., and WHITFIELD, CHAPMAN and THOMAS, J. J., concur.

BROWN, J., dissents.

WHITFIELD, J. (concurring).—Under Chapter 1688, enacted prior to the present Constitution the Governor ap-

pointed the principal municipal officers of the City ·of Pensacola, and the Act was sustained in *Ex Parte* Wells, 21 Fla. 280; Saunders v. Provisional Municipality, 24 Fla. 226, 4 So. 801.

To confer express organic authority for the exertion of such legislative powers as was done in the enactment of Chapter 1688, above referred to, the Constitution of 1885 contains Section 8, Article VIII, which confers upon the Legislature "power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time." The words, "to alter," confer a broader power than do the words, "to amend." Every word of the Constitution should be given its appropriate effect. See State *ex rel.* v. Butler, 70 Fla. 102, 69 So. 711; Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963; Ann. Cas. 1914B, p. 916; Halle v. Einstein, 34 Fla. 589, 16 So. 554; Myers v. United States, 272 U. S. 52, 47 Sup. Ct. 21, 71 L. Ed. 160.

The policy of the State with reference to its municipalities was not adequately expressed in Section 24 of Article III of the Constitution, and Section 8 of Article VIII, was incorporated in the Constitution to more fully express the policy of the State.

Section 8, Article VIII of the Constitution is in effect an approval of the principles and policy announced and applied in *Ex Parte* Wells, 21 Fla. 280; and using the words, "to alter or amend," gives express authority to change the policy or principles underlying the provisions of a municipal charter in this State, so that officers of a municipality may be appointed by the Governor or otherwise chosen as statutes may enact.

Such power expressly conferred by the Constitution of 1885 was exerted in the enactment of Chapter 3952, Acts of

1889, authorizing the Governor to appoint the principal officers of the City of Jacksonville, which statute was put into operation and was not held invalid by the courts. See Chapter 4301, Acts of 1893, which amended Chapter 3952 by repealing all conflicting laws. Thereafter the Legislature in 1903 proposed an amendment to repeal Section 8, Article VIII of the Constitution, but the electors of the State rejected the amendment. See Acts of 1903, p. 644, at bottom.

Section 27, Article III of the Constitution is not inconsistent with Section 8, Article VIII, or other provisions of the Constitution.

TERRELL, C. J., and BUFORD, CHAPMAN and THOMAS, J. J., concur.

BROWN, J., dissents.

TERRELL, C. J. (concurring).—I agree to the opinion of Mr. Justice WHITFIELD and Mr. Justice BUFORD because I think the case is concluded by *Ex Parte* Wells, 21 Fla. 280, and Saunders v. Provisional Municipality, 24 Fla. 226, 4 Sou. 801, but I think the doctrine of these cases is outmoded and should be modified.

BROWN, J. (dissenting).—This case involves an extremely important question—the rights of cities and towns to local self government.

The main question involved might be more particularly outlined as follows: "Where the Legislature by a local Act purports to abolish an existing municipality and simultaneously create a new municipality with the same name, substantially the same form of government, within the same boundaries, embracing the same population, and possessed of substantially the same powers and functions, owning the same property, obligated to pay the same debt and liabili-

ties as the old municipality, but which Act attempts to legis-late out of office the elected governing body and legislate into office a new governing body composed of members to be appointed by the Governor to hold office for a period of sixteen months, without including in the Act a referendum clause or otherwise giving the citizen of the city any choice in the matter whatsoever, is not such Act or at least that part of it attempting to change the personnel of the city commission, unconstitutional and void?

·I think this question should be answered in the affirmative for much the same reasons as were stated in my dissenting opinion in the case of State *ex rel.* Johnson v. Johns (the Hollywood case), 92 Fla. 187, 109 So. 228, and my concur-ring opinion in the case of State *ex rel.* Landis v. Ault (the Hialeah case), 129 Fla. 686, 176 So. 789.

I do not question the motives of the Legislature in passing this particular Act, but I do question its powers to pass an Act of this nature.

It is true that Section 8 of Article VIII of our Constitu-tion vests the Legislature with the power to establish and to abolish municipalities, to *provide* for the government (not to govern them) and to prescribe their jurisdiction and powers and to alter or amend the same at any time; provided that provision shall be made for the protection of its creditors. But in Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716, we held that the powers vested in the Legis-lature must be construed in connection with the Constitution as a whole, every work of which should be given effect, and that in the exercise of the power given to the Legislature by Section 8 of Article VIII it could not violate any other provision of the Constitution either express or implied.

Webster's New Unabridged Dictionary, Second Edition, defines the word "municipal" as follows:

"Municipal, adj. (L. *municipalis,* fr. municeps an inhabitant of a *municipium,* or town possessing the right of Roman citizenship, a free town; fr. *munia* official duties, the root of *capere* .to take. See mean common: Heave,) 1. *Rom. Hist.* of or pertaining to,. or of the nature of a *municipium;* as municipal rights. 2. *a.* Enjoying a local self-government like that of the Roman *municipium;*—said of a· town, city, etc. *b.* Of or pertaining to, or characteristic of, such a ·corporation. 3. Of or pertaining to the internal or governmental affairs of a state, kingdom, or nation—used chiefly in the phrase *municipal law.*"

The same Dictionary defines the word "municipality" as follows:

"Municipality, n.; pl. -ties (F. Municipalite.)

"1. A town, city, or other district having powers of local · self-government; a municipal corporation; also, the community under the jurisdiction of a municipal government; specif., a *municipium.* Cf. Borough, 6a.

"2. The administrative area into which provinces are divided, comprising· a number of barrios. See Poblacion. Phil. 1."

So the strongest characteristic of the Dictionary definition of these words clearly shows that the word "municipal" means enjoying a local self government, and the word "municipality" means a town or a city having powers of local self government.

As shown in my two previous opinions in the Hollywood and in the Hialeah cases, above referred to, this Dictionary meaning coincides with the .historical meaning of these words.

It is a well-settled rule of constitutional construction that words should be given their plain and obvious meaning, the meaning that they had at the time the Constitution was

written. Applying this rule when the Constitution said that the Legislature should have the power to establish "municipalities," is necessarily meant self-governing municipalities. Of course, the Legislature has the power to establish municipalities with various differing charter previsions, and they can alter these charter provisions. But the Legislature has no power under the Constitution to create municipalities devoid of the power of self-government. And that is what the Legislature has attempted to do in this case, for a period of sixteen months. To hold otherwise would also violate the time-honored principle that there shall be no taxation without representation. We Americans thought enough of that principle to go to war with Great Britain about it. That was one of the main causes of the Revolution. If the Legislature has the power, at will, whenever it meets, by going through the form of abolishing and establishing a municipality at one and the same time, and by such act to remove from office the elected officers of the municipality and place in the governing body of the municipality officers of its own selection, or provide for their selection by the Governor, which governing body and which officers have the power of levying and collecting taxes, then we plainly have taxation without representation. Whether there be any specific provision of the Constitution which prohibits this, it certainly constitutes a radical departure from one of the fundamental principles of American government, both national, State and local.

Section 2 of the Declaration of Rights, in our State Constitution, provides that "All political power is inherent in the people." The election of the officers who shall conduct the government of a municipality is certainly a political power and is inherent of the people of a municipality. The Declaration of Rights, which constitutes the first 24 sections

of our Constitution, embraces the cardinal features of Magna Charta, and the Bill of Rights, which were wrung from reluctant monarchs in Great Britain by the blood and self-sacrifice of our forbears, and also most of the provisions of the Bill of Rights of our Federal Constitution, represented by the first 10 amendments, and makes some additions thereto.

Even when exercising the broad powers vested in the Legislature by Section 8 of Article VIII of the Constitution, the Legislature cannot act arbitrarily and in disregard of other rights, either express or implied, that are given to the people by the Constitution. Thus the Legislature cannot destroy the political rights of the inhabitants of a city or town, nor can it directly or through its own named or appointed agents, impose municipal taxes upon the citizens and property owners of the city or town. Thus, Section 5 of Article V of the Constitution provides that: "The legislature shall *authorize* the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purposes," but it does not give the legislature the power to itself, or through its agents, to assess or impose such taxes.

The doctrine that the Legislature has unlimited powers with reference to municipalities was directly repudiated by this Court in the case of State *ex rel.* Davis v. City of Stuart, 97 Fla. 69, 120 So. 335, 97 A. L. R. 1307. It was held in that case that under our constitutional system, arbitrary and unlimited power is not vested in any department of the State government. Attention was called in that case to the fact that it is significant that our Constitution, in the Declaration of Rights, commences by specifying those things which the State government cannot do, before specifying certain things that it may do. The Declarations

of Rights have their roots deep in the past and have cost us and our forefathers much, and breathe the spirit of that sturdy and self-reliant philosophy of individual liberty and responsibility which underlies our entire system of government. It is true, they are old; but so are the Ten Commandments and the law of gravitation, and nearly every other fundamental truth. In the Stuart case it was said:

"No race of hot-house plants could ever have produced and compelled the recognition of such a stalwart set of basic principles, and no such race can preserve them. They say to arbitrary and autocratic power, from whatever official quarter it may advance to invade these vital rights of personal liberty and private property, 'Thus far shalt thou come, but no farther.' They constitute a limitation upon the powers of each and all the departments of the State government. Thus no department, not even the legislative, has unlimited power under our system of government. These declarations even limit to some extent, the exercise of the tremendous, but inherent and well established powers of taxation and eminent domain." Cooley Const. Kim., 8th Ed. 533-602; 1108-1222; 1026-1039; 1062-3. Cooley on Taxation, 4th Ed., Secs. 58, 67, 69, 131, 143, 144, 247-9, 925."

Judge Cooley, one of the greatest authorities on Constitutional law which this country has ever had, said: "The State may, mold local institutions according to its views of policy or expediency, but local government is a matter of absolute right and the State cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the State not only shaped it government, but at discretion sent in its own agents to administer it;" etc.

The New York Court in the case of People *ex rel.* v.

State Board of Tax Commissioners, 174 N. Y. 417, 63 L. R. A. 884, had this to say:

"The principle of home rule, or the rights of self-government as to local affairs, existed before we had a Constitution. Even prior to Magna Charta, some cities, boroughs, and towns had various customs and liberties which had been granted by the Crown, or had subsisted through long use, and among them was the right to elect certain local officers from their own citizens, and, with some restrictions, to manage their own purely local affairs. These customs and liberties with other rights, had been so often trampled upon by the King as to arouse deep hatred of centralization of power and we find among the many grants of the Great Charter that 'the city of London shall have all its ancient liberties and its free customs as well by land as by water. Furthermore, we will and grant that all other cities and burghs and towns * * * shall have all their liberties and free customs.' (Chap. 13.) * * *. After this marvelous statute, rights, which before had rested largely on custom, rested on law, with a guaranty against violation by the amazing covenant of King John that, if he refused redress for an 'excess committed,' his subjects should be released from their allegiance, and at liberty to make war upon him, 'saving harmless our person and the persons of our Queen and children and when it hath been redressed they shall obey us as they have done before.' Chap. 61.

"The rights thus secured after a long struggle and by great pressure, although at times denied and violated by the ruling monarch, were never lost, but were brought over by the colonists the same as they brought the rights to breathe, and they would have parted with the one as soon as the other."

In another case the same eminent court said: "This

right of self-government lies at the foundation of our institutions, and cannot be disturbed or interfered with, even in respect to the smallest of the divisions into which the State is divided for governmental purposes, without weakening the entire foundation." (150 N. Y. 459.)

This Court has said in several cases that municipalities are legal entities, established for local governmental purposes, and in one case, Kaufman v. City of Tallahassee, 94 So. 697, 84 Fla. 634, it was said:

"This Court has constantly adhered to the doctrine of municipal liberty in the administration of local affairs so far as the same is consistent with the provisions of our Constitution, prescribing the jurisdiction and powers of a municipality."

And in West v. Town of Lake Placid, 97 Fla. 127, 120 So. 361, this Court said, speaking through Mr. Justice STRUM:

"In its purely governmental relations, a municipality is a subordinate political subdivision of the State, created for purposes of local government."

It is true that there is no specific provision of our Constitution guaranteeing local self government to cities and towns, but it was a right which existed at the time of, and for centuries before, the adoption of our Constitution, and is therefore embracing within the closing section of the Declaration of Rights which provides that: "This enunciation of rights shall not be construed to impair or deny others retained by the people."

For these reasons, as well as for those set forth in my preceding opinions in the Hollywood and Hialeah cases above referred to, I am of the opinion that the motion to quash the information in quo warranto should be granted.

I might say also that I am of the opinion that the preamble

to this Act showed what its purpose was, and that the identity of the municipality was not destroyed by the Act, the new charter and the old charter except as to the attempt to change the personnel of the governing body, being substantially the same. The preamble shows that the purpose of the Act was to oust the then elected and acting city officers and to install others in their places. See Dillon Munic. Corp. (Vol. 1, Sec. 339; McQuillin, Munic. Law, 2d Ed., Vol. 1, 790-791, Vol. 2, p. 182; Broughton v. City of Pensacola, 93 U. S. 266, 23 L. Ed. 896.

There is also serious doubt in my mind as to whether the Senate Journal complied with that provision of Section 21 of Article III of the Constitution which requires that: "The fact that such notice was·established in the Legislature shall in every case be recited upon the Journals of the Senate and of the House of Representatives."

However, I believe that the reasons hereinabove given are sufficient to show the invalidity of this Act or at least that part of it attempting to oust the acting elected officers and place others in their stead, without resorting to the question arising under Section 21 of Article III, last mentioned.

The questions discussed in the foregoing opinion appear not to have been considered or ruled upon in *Ex Parte Wells*, 21 Fla. 280, but in so far as the holding therein is inconsistent with the right of municipal self government, I think that case should be overruled. The same might be said of the Saunders case, 24 Fla. 226, 4 So. 801. Both these cases construed an Act passed before the Constitution of 1885 was adopted. It is not too late now to return to what I believe to be the true and sound construction of our present Constitution.