Margaret Neff, a widow, v. City of Jacksonville and Town of Green Cove Springs

190 So. 468
Division B
Opinion Filed July 7, 1939

*Knight & Knight,* for Appellant.

*Austin Miller, Gov. Hutchinson and Eli Finkelstein, George L. Rutherford, & Thomas J. Rivers,* for Appellees.

Chapman, J.—The record in this case shows that the

City of Jacksonville, Florida, and the Town of Green Cove Springs, Florida, on the 27th day of February, 1939, signed a written contract whereby the City of Jacksonville agreed to construct an electrical transmission line from its substation at Orange Park to the Town of Green Cove Springs and connect it with the generating plant of the Town of Green Cove Springs and supply electrical energy of approximately 13200 volts pressure. The contract was to continue in force for a period of ten years, and under the schedule of rates charged the net minimum charge or obligation to be paid by the Town of Green Cove Springs to the City of Jacksonville was the monthly sum of $500.00. The City of Jacksonville is hereinafter referred to as the "city" and the Town of Green Cove Springs as the "town."

The pertinent and material portions of the contract necessary for a decision of this case are, viz.:

"The City proposes to install the aforesaid transmission line along the existing route of State Highway No. 3 from its existing substation in the Town of Orange Park to the Town of Green Cove Springs and along such streets as may be mutually agreed upon in said Town of Green Cove Springs to the existing generating plant of said Town; at which point the City will furnish and install the necessary disconnecting switches and circuit breakers, meter and metering equipment, and substation and substation equipment, and substation transformers of a nominal capacity of 300 KVA for reducing the transmission pressure of thirteen thousand two hundred (13,200) volts to the required distribution pressure of two thousand two hundred (2,200) volts and extend necessary 2,200 volt feeder lines from aforesaid transformers to the Town's main switchboard in its aforesaid generating plant.

"The Town agrees that it will provide all necessary rights of way along and through its streets, and will furnish all

necessary housing for City's transformers, metering and other substation equipment, at its existing generating station, without cost to the City.

"The Town also agrees that if at any time during the life of this contract it is found that its increased demands require a susbtation transformer capacity greater than the nominal transformer capacity of 300 KVA to be furnished by the City as hereinabove provided, then in that event the Town agrees that it will furnish, install and maintain such additional substation transformers as may be required, without cost to the City.

"Article II—Agreement to Furnish Electrical Energy

"The City agrees to sell at the price and conditions hereinafter set forth, and supply at the existing generating station of the Town, to the Town, electrical energy known as 60 cycle, 3 phase alternating current of approximately 13,200 volts pressure. An extreme variation of ten per cent (10%) from such approximate voltage at the Town connection will be accepted as compliance herewith.

"Article III—Term of Agreement

"The term of this agreement shall be for a period of ten (10) years from the date thereof, and it shall continue in force for successive periods of one (1) year each thereafter, until either of the parties hereto shall, not less than six (6) months previous to the expiration of the then current period, notify the other party in writing of its desire to terminate the agreement at the end of the then current period.

"Article IV.—Interruption in Supply of Electrical Energy

"The City shall at all times exercise due diligence in operating its plant and equipment so as to furnish the Town as

near as practicable a continuous supply of electrical energy. If the City shall be prevented, wholly or in part, from delivering electrical energy as herein provided because of injuries to or breakdown of its commercial plant, transmission lines or other equipment, or necessary repairs thereto, or because of governmental interference, or for any cause not reasonably within its control, the Town shall have no action against the City for damages occasioned thereby, but the City shall, unless the result be a practically total destruction of its property, proceed with all reasonable diligence to put itself and its works in condition to continue the electric service. During the existence of each interruption in or curtailment of service, the City shall furnish to the Town so much energy as it is able to furnish pro rata with the rightful requirements of its own uses and of its other customers.

"In the event of any interruption of or curtailment of service, the Town shall be entitled to a pro rata reduction for the time being in the monthly minimum charge provided for herein, and in the event that such interruption or curtailment continues for a period of one (1) month or more, the date of expiration of this agreement as set forth in Article III hereof shall, if the Town so desires, be extended by the full period covered by such interruption or curtailment.

"Article V.—Suspension of Use

"If the Town, on account of unavoidable accidents, fires, floods, governmental interference, or causes not reasonably within its control, shall be prevented at any time from taking and using electrical energy hereunder, the Town shall be entitled to pro rata reduction for the time being in the monthly minimum charge provided for herein. The Town agrees in each case of such shutdown, interruption or inter-

ference, to proceed with all necessary diligence to put its works in condition to utilize again and thence forward the normal amount of electrical energy, and in the event that such shutdown, interruption or interference continues for a period of one (1) month or more, the date of expiration of this agreement as set forth in Article hereof shall, if the City so desires, be extended by the full period covered by each shutdown, interruption or interference.

"ARTICLE VI.—AGREEMENT TO PURCHASE ELECTRICAL ENERGY

"The Town, during the life of this contract, agrees to purchase from the City, and the City agrees to deliver to the Town, not to exceed a maximum demand of one thousand (1,000) kilovolt-amperes (KVA) under this contract, upon the terms hereinafter expressed, all of the electrical energy needed by the Town in its business, for municipal purposes or for resale to its citizens and other consumers. The Town agrees that it will not purchase or receive, directly or indirectly, electrical energy from any other source and that it will not generate any electrical energy from its own generating plant during the life of this contract, provided the City is prepared to deliver the energy required by the Town and provided that the Town may generate and take electric energy from its own generating plant in the event of an emergency caused by failure, interruption or curtailment of the City's service.

"The Town also agrees that it will not, during the life of this contract, grant to any other person, firm or corporation any right, franchise or permission to furnish, distribute, supply or sell electrical energy for light, heat or power to any other person, firm or corporation within the corporate limits of said Town.

"Article VII.—Price of Electrical Energy

"From and after the date when the Town shall first be able to take and use electrical energy in its operations, under this contract, the Town shall pay to the City, on or before the 10th day of every month thereafter, an amount equal to the following rules and charges, to-wit:

"The Town hereby agrees to pay to the City for all electrical energy taken or used at the rates per kilowatt hour stated in the following schedule:

## "energy charge

"Two cents ($.02) per kilowatt hour for the first twenty thousand (20,000) kilowatt hours per month.

"One and one-half cents ($.015) per kilowatt hour for the next twenty thousand (20,000) kilowatt hours per month.

"One and one-fourth cents (.0125) per kilowatt hour for the next twenty-five thousand (25,000) kilowatt hours per month.

"One cent ($.01) per kilowatt hour for the next thirty-five thousand (35,000) kilowatt hours per month.

"Nine-tenths of one cent ($.009) per kilowatt hour for all kilowatt hours per month in excess of one hundred thousand (100,000).

"The foregoing are not energy rates without demand charges and without discounts.

## "minimum charge

"Because of the City making or having made the investment in and maintaining the plant and equipment necessary to deliver electrical energy to the Town, the Town hereby agrees that from and after the date when it shall first be able to use electrical energy furnished by the City under this agreement, in the event that any monthly bill for energy, as computed in accordance with the foregoing schedule of rates, is less than Five Hundred Dollars ($500.00), a net

minimum charge of Five Hundred Dollars ($500.00) per month shall be made by the City and paid by the Town.

"TERMS OF PAYMENT

"Bills covering the energy charges, or minimum charges, determined as provided herein, shall be rendered monthly on approximately the first day of each month and shall be paid at the office of the City Treasurer within ten (10) days of the date thereof, as hereinbefore provided. * * *

"ARTICLE IX.—MEETING

"The electrical energy taken or used by the Town, under this agreement, shall be measured at the supply or transmission pressure of thirteen thousand two hunderd (13,200) volts by suitable metering equipment furnished, installed and maintained by the City. If any meter so installed fails to register properly at any time during any month, the proper registration during such month shall be determined from other meters or estimated upon the basis of corresponding period in which the Town's electric system was operated under conditions similar to those existing during the month in which the failure to register occurred.

"No allowance shall be made on any bill on account of claim for inaccuracy of measurement, unless the Town shall, in writing, request such allowance within thirty (30) days from the date on which such bill is rendered, and shall apply for proper test or recalibration of the meter. If it shall be shown by test that the meter is inaccurate to the extent of 2% or more, proper allowance, as shown by the test to be necessary, shall be made to the party entitled thereto, but not for a longer period than that covered by the bill on account of which allowance is claimed.

"The Town shall not open the meter, nor interfere with the City's apparatus or equipment, nor permit any unauthorized person to do so.

"The meter installed by the City under this agreement shall be only the recording watt hour meter required for determining the charges for electric service hereunder.

## "Article X—Utilization Equipment

"The town shall, at its own risk and expense, furnish, install and maintain all necessary apparatus and equipment for utilizing the energy to be supplied hereunder, such as switchboards, switches, circuit breakers, safety devices, wiring, distribution lines, distribution transformers, etc., and said installation shall be of such character as will not introduce undue and unnecessary disturbance on the City's transmission line.

## "Article XI.—Power Balance

"The Town shall take and use electrical energy hereunder from each of the phases in such manner that the total energy taken shall be divided as equally as practicable between the three (3) phases.

## "Article XII.—Inspection

"The authorized agents or employees of the City shall have the right to enter the Town's substation at all reasonable times for the purpose of inspecting, testing, installing, repairing or changing the City's apparatus, or removing such apparatus from the premises either during or after the termination of this agreement. The City may temporarily suspend delivery of electric service at reasonable times when necessary for the purpose of inspection or repairs, provided that such notice thereof shall be given as circumstances permit.

## "Article XIII.—Agreement Concerning the Furnishing of Electric Service to Other Consumers

"The City hereby reserves the right under this agreement to furnish electric service to other consumers, from its pro-

posed transmission line, along the route of and contiguous to State Highway No. 3 in the territory traversed by said highway between the drawbridge crossing Doctor's Inlet and the drawbridge crossing Black Creek, in Clay County, Florida, but the City hereby agrees that it will not furnish or attempt to furnish electric service to any consumer along the route of or contiguous to said highway in the area lying between the drawbridge crossing Black Creek and the Town of Green Cove Springs nor in any territory in the immediate vicinity of said Town, except by mutual agreement and the express consent of the proper officials of said Town, first obtained in writing. The Town hereby agrees that it will not extend its lines nor furnish or attempt to furnish electric service to consumers in the territory hereinbefore described as lying between Black Creek and Doctor's Inlet.

"ARTICLE XIV.—TIME LIMIT FOR COMPLETION OF WORK

"The City hereby agrees that immediately after the execution of this agreement by the parties thereto it will proceed with the necessary financial arrangements and will commence with the necessary financial arrangements and will commence and complete the construction of the necessary transmission line and service equipment at the earliest possible date and agrees to complete and work and commence delivery of electric service to the Town at a date not later than six (6) months after the execution of this agreement.

"The Town hereby agrees that it will put its works in order and will accept delivery and proceed with the use of the City's electric service at such time, within six (6) months after the execution of this agreement, when the City shall notify the Town of its readiness to commence delivery to the Town of electrical energy, under the terms and conditions of this agreement.

"ARTICLE XVI.—LIABILITY FOR ACCIDENTS

The Town shall save the City harmless from any and all claims that may be made against it, whether by the Town, its officers, agents or employees, or any third party, for the loss or damages sustained within the corporate limits of the Town or in territory adjacent thereto, which is served by its electric distribution system, in connection with the supply or use of electrical energy hereunder, unless the same be due to or the result of the sole negligence of the City, its officers, agents or employees.

"ARTICLE XVI.—DEFAULT

"If the Town shall make default in the performance of any obligation under this agreement, and shall continue in default for a period of thirty (30) days after notice from and after written demand by City on Town, the City may suspend service, but such suspension of service shall not interfere with the enforcement by the City of any other legal right or remedy, and at its option the City may cancel this agreement in the event of any such default and its continuance as aforesaid. No delay by the City in enforcing any of its rights hereunder shall be deemed a waiver of such rights, nor shall a waiver by the City of one of the Town's defaults be deemed a waiver of any other or subsequent default.

"In the event of such default followed by such suspension of service or such cancellation, such action shall not deprive the City of any other rights which it may have in these premises.

"No dispute with reference to the amount due for electric service hereunder shall excuse the Town from paying when due the amount stated by the City to be due, but any amount which the Town may have so paid in excess of the amount

actually found upon investigation to be due shall be promptly refunded by the City.

"If the City shall make default in the performance of any obligation under this agreement except from causes not reasonably within its control, and such default shall continue for a period of thirty (30) days after notice from and written demand by Town on City, the Town at its option may cancel this agreement in the event of any such default and its continuance as aforesaid. No delay by the Town in enforcing any of its rights hereunder shall be deemed a waiver of such rights, nor shall a waiver by the Town of one of the City's defaults be deemed a waiver of any other or subsequent default. In the event of such default, followed by such cancellation, such action shall not deprive the Town of any other rights which it may have in these premises.

"Article XVII.—Revision and Adjustment of Rates

"It is mutually understood by the parties hereto and is hereby made a part of this agreement that, at the end of any current one-year period during the life of this contract, the schedule of energy charges or rates set forth in Article VII hereof, may, by mutual agreement of the parties hereto, be revised, adjusted and amended to such an extent as existing conditions may warrant. No such revision, adjustment or amendment to the schedule of rates shall be held to effect, modify, amend or change any other provision or Article of this agreement nor to effect the validity of the contract as a whole.

"Article XVIII.—Extent of Obligation

"This agreement shall insure to and bind the respective successors and assigns of the parties hereto, and whenever in this agreement either of the parties shall be indicated or

mentioned, such mention shall be made and held to include the respective successors and assigns of the parties."

The appellant here, Margaret Neff, exhibited in the Circuit Court of Duval County, Florida, her bill of complaint alleging that she was a citizen, resident and taxpayer of the Town and a customer of its municipal plant and that the Town did not have to its credit sufficient funds as required by its charter on February 27, 1939, authorizing it to enter into the alleged contract; that the charter of the Town required an election and approval of the voters of the Town prior to the granting of a franchise and that the alleged contract in law was a franchise or its equivalent; that the performance of the contract was tantamount to or meant an abandonment of the Town's light plant which rendered it worthless and a complete loss to the Town that the contract was a general obligation of the Town which could not be entered into without an approval of a majority vote of the freeholder electors of the Town as required by amended Section 6 of Article IX of the Constitution of Florida as required by amended Section 6 of Article IX of the Constitution of Florida adopted at the general election held in Florida on November 4, 1930. The bill of complaint prayed for a temporary injunction or restraining order from the performance of the contract by the City and the Town.

The City and the Town each filed answers and motions to dismiss the bill of complaint and on a hearing the motions of defendants to dismiss were denied; the motion of the plaintiff for a final decree on bill and answers likewise was denied and the equities of the cause were decreed to be with the defendants below, and appellees here, and the cause was dismissed. From this decree an appeal has been perfected and several assignments presented and argued for a reversal.

It is admitted by counsel for the respective parties, and

we think correctly so, that the City of Jacksonville has the power to enter into and fully perform the terms and provisions of the contract now before the court, while counsel for the City and Town contend that the Town of Green Cove Springs has the charter power not only to enter into the Contract, but to fully perform each of its terms and provisions, not because of its governmental authority, but because the performance thereof was incidental to its corporate existence. Counsel for the taxpayer contend that the contract is void for the reasons, viz.: (a) the contract is a bond within the meaning of amended Section 6 of Article IX; (b) the legal effect of the contract is to grant to the City a franchise without an election as provided or required by Section 2 of Article 6 of Chapter 6350, Laws of Florida, Acts of 1911, being the Charter of the Town of Green Cove Springs; (c) Section 5 of Article 10 of Chapter 6350, *supra,* the charter of the Town provides that the Commission shall not have the authority to incur any indebtedness or obligation whatsoever unless the funds shall be in hand to pay the same. The record shows that the Town had on deposit less than $500.00 on November. 16, 1938.

In the case of State and Diver v. City of Miami, 113 Fla. 280, 152 So. 6, the Court had before it a proceeding to validate water revenue certificates to be sold and the money arising therefrom used for the construction of certain additions, replacements and improvements to the water system of the City of Miami. The loan was to be repaid solely from the net revenues derived from the operation of the property owned by the City and the water revenue certificates did not directly, or indirectly, or contingently obligate the City of Miami to levy or collect any taxation whatsoever therefore, neither was it necessary for the water certificates to be paid in whole or in part from taxes of the City. The water certificates did not create a general ob-

ligation or debt against the City of Miami requiring the payment thereof by a tax levy but the water certificates were to be paid only from revenues derived from the operation of the utilities of said city. This Court held that it was not necessary to obtain a vote of the freeholders of the City of Miami as a prerequisite for the issuance of the water revenue certificates required by amended Section 6 of Article 9 of the Constitution of Florida as amended in 1930. See State v. City of Lake City, 116 Fla. 10, 156 So. 924; State v. City of Daytona Beach, 118 Fla. 29, 158 So. 300; Wilson v. City of Bartow, 124 Fla. 356, 168 So. 545; State v. City of Clearwater, 124 Fla. 354, 168 So. 546; State v. City of Punta Gorda, 124 Fla. 512, 168 So. 835; Leon County v. State, 122 Fla. 505, 165 So. 666; Tapers v. Pichard, 124 Fla. 549, 169 So. 39; Roach v. City of Tampa, 125 Fla. 62, 169 So. v. 627; Boykin v. Town of River Junction, 124 Fla. 827, 837, 169 So. 492; State ex rel. City of Vero Beach v. MacConnell, No. 1, 125 Fla. 130, 169 So. 492; State ex rel. City of Vero Beach v. MacConnell, No. 1, 125 Fla. 130, 169 So. 628; Sharp v. City of Bradenton, 135 Fla. 604, 185 So. 346; State v. City of Clearwater, 135 Fla. 112, 184 So. 675.

Where a municipality owns a utility in a corporate or proprietary capacity and from which it derives annual net revenues and desires to repair, enlarge or extend said utility, it may do so by pledging the net revenues of the utility and not create or establish a direct or indirect pledge or obligation on the part of the municipality's taxing power and this may be accomplished under the authorities cited above without a vote of the freeholders of the municipality as contemplated by Section 6 of Article IX of the Constitution as amended. While it is admitted here that the Town owns in a proprietary capacity an electric plant and has supplied electric energy to the citizens of the Town, and the appellant

here is admitted to be one of its customers, it has not been made to appear that the plant has a net annual revenue or that the Town desires to extend, improve or enlarge the same or to pledge the net revenues arising therefrom so as to supply the inhabitants thereof with electric energy; neither does it affirmatively appear on this record that the obligation, *supra,* will not pledge or obligate the taxing power of the Town within the next ten years. It is admitted that an election has not been called or the freeholders of the Town allowed to vote thereon as required by Section 6 of Article IX, Constitution of Florida.

It is to be observed that the contract, *supra,* provided for a net minimum monthly charge of $500.00 against the Town. The contract is to be binding as between the Town and the City for a period of ten years and the total of the minimum payment is the sum of $60,000.00. The plan of monthly payments by the Town to the City for this electrical energy is not clearly expressed by the terms of the agreement. It is possible that these monthly obligations may be retired by the charges made for and money received for electricity consumed by the inhabitants of the Town, but this fund or resource of revenue is not pledged by the terms of the contract. We are at a loss to understand how the monthly payments stated in the contract can be made by the Town without directly or indirectly resorting to its governmental taxing power. If the Town assumes an obligation which contingently places a duty on it to exercise the governmental power of taxing the property and the people of the Town, then the same is inhibited by Section 6 of Article IX as amended. We think the obligation here may directly or indirectly or contingently place a debt or liability upon the property, or people of the Town which may require a discharge by the exercise of its governmental power of taxation. Any instrument evidencing a county, district or mu-

nicipal indebtedness for providing a new project or to be paid by a tax levy or by assessment or charges or the pledge of property or a tax resource of the subordinate governmental unit, may in effect be a bond and require an approval of the freeholder electors as provided by Section 6 of Article IX of the Constitution before the said instrument may be legally issued. See Kathleen Citrus Land Co. v. City of Lakeland, 124 Fla. 659, 169 So. 356; Leon County v. State, 122 Fla. 505, 165 So. 666; Boykin v. Town of River Junction, 121 Fla. 902, 164 So. 558; Williams v. Town of Dunnellon, 125 Fla. 114, 169 So. 631; State v. City of Coral Gables, 114 Fla. 326, 154 So. 234; Hygema v. City of Sebring, 124 Fla. 683, 169 So. 266.

Having reached the conclusion that the instrument before us is in legal effect a bond and the freeholder electors of the Town have not had an opportunity to vote or otherwise express their views thereon, as contemplated by Section 6 of Article IX of the Constitution of Florida as amended, it is necessary to decide the other questions raised by this appeal but it becomes our duty to reverse the decree appealed from. The decree appealed from is reversed for further proceedings in the lower court not inconsistent with this opinion.

It is so ordered.

WHITFIELD, P. J., and BROWN, J., concur.

BUFORD, J., concurs in opinion and judgment.

Justices TERRELL and THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.