STATE and R. C. GARDNER, Appellants, v.
CITY OF MIAMI, Appellee.

200 So. 535
En Banc
Opinion Filed February 25, 1941
Rehearing Denied March 8, 1941

G. A. Worley, for Appellant State of Florida;

Aronovitz & Goldstein, for R. C. Gardner, Intervenor;

Lewis Twyman, J. W. Watson, Jr., and Sidney S. Hoehl, for Appellee.

THOMAS, J.—The system whereby water is furnished to consumers of Miami and environs may be said to consist of two parts: one for the pumpage, purification and preparation of the commodity for consumption, the other for distribution of it to users through pipes. The former is owned by the city, the latter by private corporations. It was to combine them and bring the entire production and dispensation under the ownership, hence regulation and control, of the city that the laws were passed by the State Legislature, the resolution adopted by the city commission and the litigation instituted which gave rise to this appeal, the matter being presented

to us on the challenge of the State and an intervenor to the chancellor's decree validating water revenue bonds of the aggregate par value of eight million dollars.

The final order based on the petition for validation, the answers and the testimony relevant to these pleadings was comprehensive in the findings and conclusions reached after an obviously careful study of the issues involved. A digest of the decree at the outset may be helpful in understanding the points to be determined in this opinion.

Facts found by the chancellor were that the city's part of the water system was acquired at a cost approximating three million five hundred thousand dollars, paid by general bonds of more than two million dollars, water revenue certificates, payable from the net income of the system, in the sum of eight hundred ninety thousand dollars and grants from the United States of America of something more than four hundred thousand dollars. The water revenue certificates were confirmed by the circuit court and one of the decrees of validation was appealed to Supreme Court and affirmed (State and Diver v. City of Miami, 113 Fla. 280, 152 So. 6). He decided that the combination of the production and distribution systems was necessary to the efficient supply of water to the territory served by the constantly growing city. Under the authority of Chapters 19980 and 19982 of the Laws of Florida, Special Acts of 1939, a resolution, numbered 16592, was adopted by the city commission providing for consolidation of the two plants by buying the ones privately owned and paying therefor from the proceeds of an issue of water revenue bonds to be retired only from the money received for the sale of water. In accordance with the provisions of this resolution a contract was executed by the city and the corporations for the purchase by the former of the property of the latter, and this contract was approved by the voters

at an election held for the purpose. The court was convinced by the appraisals that the actual value of the system to be bought exceeded the agreed purchase price. The judge determined, further, that the money received from the sale of the bonds was to be applied to: (1) refunding outstanding revenue certificates ($367,000); (2) buying the distribution system ($4,500,000); and (3) paying the net cost of betterments subsequent to August 1, 1938, purchasing accounts receivable, defraying expenses incident to the transfer and the like ($3,133,000). The resolution provides for a trust agreement setting out the conditions governing issuance of the bonds, and the rates to be charged to insure funds for the ultimate payment of the indebtedness. The gross income from the distribution system for a period of five years was analyzed by the court and the anticipated net income declared sufficient to retire the indebtedness as outlined in the trust agreement.

The court concluded as a matter of law that the bonds and the execution of the trust agreement were authorized by the laws and the resolution and that the bonds were not of the character contemplated by Section 6 of Article IX of the Constitution of Florida, not being a general debt of the city, but payable only from the income to be received from the combined water plant.

The water revenue bonds were validated and confirmed, and on the appeal from the decree the matter reaches this Court.

Inasmuch as the statutes we have mentioned were the source of the authority of the city to make the purchase, it seems appropriate that we consider first the strength of the attacks made upon them by the appellants. It is insisted that they cannot be valid because of defects in the notice given of their introduction in the Legislature. This notice

appeared in a newspaper published in the city of Miami, and in substance, follows:

"Notice is hereby given by the Commission of the City of Miami that it intends to offer local or special legislation for a law to authorize the City of Miami to . . . purchase, extend . . . acquire, any one or more, or any combination of, the following: . . . water works systems, including new water lines . . .; and to issue bonds for the purpose of . . . acquiring or purchase of the above municipal projects; providing how bonds may be payable either from taxes or exclusively from the revenue of such municipal improvement; providing for the procedure for the issuance of such bonds with or without an election . . . and . . . their validation; providing that the powers conferred by the act are supplemental and in addition to the powers now enjoyed and vested in the City of Miami," etc.

There is no need to reiterate what has been announced by this Court in its many opinions, such as State *ex rel.* Landis, Attorney General, v. Reardon, 114 Fla. 755, 154 So. 868, with reference to the purpose of the applicable section of the Constitution (Sec. 21, Art. III, as amended November. 6, 1928), and we shall confine our observations to the specific objections to the notice involved in the instant case. It is said by the appellants that a reader of it was not advised at what session of the Legislature an effort would be made to secure the passage of the legislation; however, the notice appeared for the first time on the 22nd day of March, 1939, in which year by the Constitution a regular session of the Legislature was held; and it was at this regular session that the statutes were introduced and passed. Further, this notice is criticized because it contains no statement that proposed legislation would be introduced "in a Legislature of the State of Florida" and it is urged that because the City of Miami has the power to enact laws

that the reader could not determine but that the intention was to have an ordinance passed by the city commission of that municipality. The objection is obviously unsound. A study of the introduction and conclusion of that part of the publication which we have quoted would give the information unmistakably that it was the city itself that intended to obtain legislative authority to authorize it to do certain things and that this authority, if given, should be in addition to the powers then enjoyed by it. Also, the notice bore the name of an individual described as "City Attorney." An elaboration on the import of the item seems futile and from our study of it we are at a loss to see how any one able to read could have been misled. Certainly he would have been charged with the knowledge that a session of the Legislature of the State of Florida was impending at the time of the circulation of the newspaper and that it was at that session that an attempt would be made to secure the passage of the Act.

The appellants raise objection to the provision in the trust indenture that the city shall pay for water taken through fire hydrants for the prevention and extinguishment of fires and for flushing streets and sewers a sum of not less than thirty dollars for each hydrant per annum, and that this charge shall not be one against the waterworks system. It is urged that in this fashion a general indebtedness is placed against the taxpayers of the City of Miami which is in effect the incurrence of a debt in violation of Section 6, Article IX, of the Constitution, no election having been held. Much comfort is found by them in the case of Neff v. City of Jacksonville, 139 Fla. 179, 190 So. 468, while the appellees scorn the criticism.

We are unable to see the analogy in the two cases or to comprehend the merit of the objection. According to the facts in the cited case, the city undertook, in a contract to

distribute to users residing in it, electricity at a certain charge and to pay the producer, the city of Jacksonville, a guaranteed net minimum charge of five hundred dollars per month. Thus, if the revenue from the sale of electricity in accordance with the rates fell below that amount, the city was liable for the difference. The obligation on the part of one to pay the other was not confined to net revenues, and it was decided that there was a contingent liability and a resultant violation of the Constitution. The relevancy of the principle announced in that case to the objection on the charge for the use of fire hydrants is difficult for us to understand.

Clearly the cost of furnishing water for use in hydrants to cleanse the streets and quench the fires is reflected in the cost of production and distribution. The city, when it uses water through its hydrants for the purpose we have stated, is a consumer, too, and there can be no revenue from the commodity used for those purposes except that paid by the city from its taxes. We are not advised that the charge is unfair or that the motive in placing this provision in the contract was to circumvent the inhibitions of the Constitution by enhancing the net available funds for the retirement of the bonds by supplementing those funds with a charge from general taxes for the use of the fire hydrants. We do not know, either, of any foundation for the fear that this charge will be increased for the deliberate purpose of augmenting the income from the combined system available to retire the bonds and if in the future any such attempt is made, one complaining would find ample remedy.

If we were, for the purposes of this discussion, to substitute electricity for water the charge would be equivalent, so it seems, to one for the use of electric lights in city buildings, and it does not appear logical that such a charge could be questioned on the theory that the rates might be

increased and therefore an additional burden placed on the taxpayers without benefit of ballot.

The appellants charge that Sections 10 and 11 of Article I of the trust agreement violate Chapters 19980 and 19982 because of the provision in the former with reference to the issuance of additional bonds. The parts of the statutes pointed out which the provisions of the trust agreement are said to violate are the ones in Section 3 stating simply that before any bonds are issued a resolution must be adopted determining, among other things, "the amount or maximum amount of bonds to be issued." The part of the trust agreement to which exception is taken provides that bonds in addition to the original amount of eight million dollars may be issued at any time to pay the cost of acquiring and constructing necessary extensions and improvements of the system. Procedure to be followed by the commission in the issuance of additional bonds is set out in the instrument and instructions and specifications for the amount, dates of maturities and other characteristics are given in detail. The appellants contend that the bonds should not have been validated because of this provision in the trust agreement that more of them could be sold at any time for the purpose of defraying the costs of improvements, extensions, renewals and replacements, which conflicted with the section of the legislative Act we have given.

From a legal standpoint we see no valid objection to this stipulation and from a practical view it seems a very wise one. It is true that there is no limitation in the number of bonds that may be issued, but it is equally true that the source of the revenue for the retirement of such bonds is restricted to the income from the sale of water and it cannot be assumed that but one issue is authorized. Two classes of bonds are contemplated in the Act, those payable from ad valorem taxes and those which may be discharged

exclusively from the revenue of the project. In the former an election is, of course, necessary and in the latter none is required. It is plain from the language employed that it is necessary that the initial resolution shall state the amount of bonds to be issued, but it cannot be construed to confine the city to one issue.

The advantage to the debtor of such an agreement is obvious. In the event of the growth of the city and the consequent necessity of expanding the system so that the commodity will be available to an increased number of users progress will be unhampered. The enlargement of the facility, which is shown by the evidence to be on a profitable basis, will in turn enhance the revenue. If the city were allowed to sell only this initial issue of bonds and could not from the plant itself finance extensions and replacements to protect the investment and to give satisfactory services to customers old and new, it would be a considerable handicap. We discuss this apparent purpose of the provision, although we realize that we are not concerned with the wisdom of the Act but only with its legality. However, mention of the practical effect is helpful in construing the motive of the Legislature.

The last point with which we deal, and perhaps the most important of those presented by the appellants, is the one whether the city could issue the water revenue bonds payable in the fashion we have described without a vote of the people as is required by Section 6 of Article IX of the, Constitution of the State of Florida, providing that a city should "have power to issue bonds only after the same shall have been approved by the majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such . . . [municipality] shall participate." Even disregarding the vote of the people approving the contract between the city and the corporations

for the purchase of the water distribution system, it seems that there is ample authority in former decisions of this Court on the subject to justify the decision that the city acted wholly within its authority in undertaking to issue the bonds payable in the manner outlined for the purposes we have described. It was clearly determined in State and Diver v. City of Miami, *supra,* that certificates payable solely from the revenue of a municipally-owned utility then existing were not bonds in contemplation of the constitutional amendment where the proceeds from their sale were to be used in the extension of the plant and there was no general liability or obligation on the part of the city to pay them at maturity. This principle was followed in at least two subsequent decisions of the Court (Spearman Brewing Co. v. City of Pensacola, 136 Fla. 869, 187 So. 365, and Clover Leaf, Inc., v. City of Jacksonville, 145 Fla. 341, 199 So. 923), and in the case of State v. City of St. Petersburg, 145 Fla. 206, 198 So. 837, an opinion was rendered by Mr. Chief Justice TERRELL which is ample authority for the determination of this proposition contrary to the position of the appellants. So far as we can learn the principle in that case and in this one are identical. An issue of waterworks revenue certificates issued to enlarge and improve the waterworks system of the City of St. Petersburg was validated by the circuit judge and his action was affirmed upon an appeal to this Court. The improvement consisted of the purchase of the properties of two companies who had undertaken to furnish water to the city for its inhabitants. The certificates were to be retired from the net revenues only and did not constitute a debt payable from taxes on other property. The definite holding was that no election, in those circumstances, was required.

After a study of the general scheme outlined in the

Acts of the Legislature, the resolution of the city commission and the further actions of the municipality in making that plan effective through the trust agreement and having scrutinized the record with the constitutional provisions in mind, we cannot reach the conclusion that there was any harmful error on the part of the circuit judge in entering the decree validating the bonds.

A great many questions have been presented which we feel are lacking in relevancy as well as merit when it is borne in mind that this was a proceeding in the circuit court for the validation of the bonds. As we have said, the main question is the one whether the election was necessary. We have the view that it was not and that in the essential details the procedure is the same as that which has been approved in our other opinions on the subject.

It is ordered that the decree of the circuit judge be affirmed.

BROWN, C. J., TERRELL, BUFORD, CHAPMAN and ADAMS, J. J., concur.

WHITFIELD, J., not participating.