STATE OF FLORIDA v. FLORIDA KEYS AQUEDUCT COMMISSION, a Body Corporate and Politic of the State of Florida.

4 So. (2nd) 662

En Banc

Opinion Filed November 20, 1941

486

*G. A. Worley,* for Appellant;

*S. P. Robineau* and *Garland M. Budd, Jr.,* for Appellee.

BUFORD, J.—Appeal brings for review decree validating $1,750,000.00 of Florida Keys Aqueduct Commission Water Revenue bonds dated September 1, 1941. The bonds are serial, maturing in various amounts annually beginning with September 1, 1944, and continuing until September 1, 1972, and bear interest at 4% payable semi-annually.

The record discloses the following factual conditions: The Florida Keys and Key West, the principal city of that area, because of geographical location and geological structure, have always heretofore been limited in the matter of supply of potable fresh water to rainfall and its watershed captured and stored in private tanks or cisterns. This supply was always uncertain, meager and insufficient, so that the inhabitants were forced to unsanitary limitations of water use or importations by railroad tank-cars, or marine tank barges, at most excessive—practically prohibitive —cost. Prior provision for adequate and sanitary supply, though frequently projected and attempted, was impossible, through financial inability of the governmental agencies and communities of the locality. Two incidents of historic happening caused the public need to attain this primary and urgent human necessity for this section of the State to become imperative. They also presented substantial means of accomplishment.

1. The national and local emergency through the Depression in 1932-5 compelled the City Council of the City of Key West in 1934 to call upon the Governor for assistance, and to surrender all municipal, official powers to him to administer the affairs of the City during the emergency (See c. 17573, Acts of Florida, 1935). Under this Emergency Measure,

ways and means were provided so that the Federal Emergency Relief Administration could administer to the tragic economic need of the people of Key West and the Florida Keys by constructing public works and thus furnish livelihood employment. Among the public works thus constructed by the Emergency Relief Agency was a fresh water distribution system in the City of Key West. And, although there was no fresh water supply available for such a system, it was constructed, nevertheless, as "something to be done to supply work" and in hopeful anticipation of one. The system was constructed entirely at the cost of the Federal Government, and imposed no burden or taxation or outlay, past, present or future, upon the taxpayers of the City of Key West. Under existing circumstances, its only possible utility was with sea water for obviously rare and limited uses, and with rapid deterioration of the metal piping.

2. The international crisis of World War II caused the re-ocupation of Key West as an active Naval Base by the United States Navy in about 1940 it having been abandoned as such some six to eight years before). This resumption of Naval activities at the old Key West Naval Station brought into the area some five thousand Naval, Military and other Federal personnel. It also introduced some five thousand additional civilian population attracted by business expectancies. This suddenly added population brought the chronic water problem of the area to a most acute crisis.

The United States Navy, to solve its own particular pressing fresh water problem for its personnel and vessels, asked the Congress for an appropriation of $2,000,000 for the development of a water supply.

The Florida State Legislature had already, in the Session of 1937, (see c. 18530, Acts of Florida, 1937) created a State Agency, the Florida Keys Aqueduct Commission, for the purpose of obtaining and supplying an adequate and sanitary water supply and distribution system for the Florida Keys and the City of Key West, in order that potable household and industrial fresh water might be supplied to the inhabitants thereof. The Florida Keys Aqueduct Commission was given powers to finance, construct and operate a water supply and distribution system in the area, and to sell such water to consumers at reasonable rates, based on debt charges, cost of operation and amortization of obligations incurred for acquisition, construction, maintenance and operation of the supply and distribution systems, the reasonableness of the rates being made reviewable by the Florida Railroad Commission.

The Congress of the United States passed its "First Supplemental National Defense Appropriation Act, 1941," approved June 26, 1940 (No. 667—67th Congress, c. 430, 3rd Sess. HR 10055), which provided the following appropriation:

"Naval Station, Key West, Florida: Development of Water Supply, including pipe line and acquisition of land, $2,000,000; *provided that said pipe line may be built in coöperation with an agency of the State of Florida.*"

The Florida Keys Aqueduct Commission was and is the only Florida State Agency authorized or empowered to act in relation to a water supply in that area. From the date of its creation, the Florida Keys Aqueduct Commission had been in negotiation with various financial sources for the achievement of its public purpose, among them, the Works Progress Adminis-

tration, Public Works Administration, and the Reconstruction Finance Corporation, as well as various private banking institutions. It had made extensive geological and engineering surveys, prepared engineers' plans and estimates, and was already near conclusion of negotiation with the Reconstruction Finance Corporation for a loan to finance the construction of water supply and distribution systems reasonably adequate for the normal civilian population of the area and the predictable increases thereof.

The re-opening of the Naval Base, the sudden revival of the Caribbean Sea and Canal Zone locale as a strategic Naval outpost of American defense, and the sudden influx of Naval, Military and other Federal personnel and their usual followers into the area, compelled revision of estimates of size and cost of water facilities in order sufficiently and immediately to accomodate the already accrued and the reasonably anticipated increase of population, both from the Naval and the civilian viewpoint.

These estimates indicated that the $2,000,000 appropriation by Congress to the Navy could only suffice to supply the Naval and Military needs for water.

The theretofore proposed supply for which the Florida Keys Aqueduct Commission was negotiating finances with the Reconstruction Finance Corporation could only supply the needs of the normal civilian population of the area.

The Congress of the United States, in realization of the limitations of the appropriation and the necessity of supplying both civilian and military needs for water, provided for a joint coöperation between the Navy and the Florida Keys Aqueduct Commission, so that an adequate water supply and distribution

system could be obtained for both Naval (including Military) and civilian populations.

Moreover, Engineers' surveys and estimates disclosed that by combining the Naval Appropriation and the finances obtainable by the Florida Keys Aqueduct Commission from the Reconstruction Finance Corporation, the water supply thus to be made available could be increased about four-fold over that which could be procured by either the Navy or the Florida Keys Aqueduct Commission acting alone.

The alternative of constructing two parallel supply lines, one for the Navy, and one for civilian utility service, was shown would be a duplication of cost of construction and operations, without proportionate increase of gross water supply capacity and utilitarian advantage. In fact, the combined capacity of two such parallel pipe lines would hardly suffice to supply the increased needs of the recently added and currently growing populations incident to each of the agencies.

It was made manifest that the Congressionally approved coöperation between the Navy and the Florida Keys Aqueduct Commission for a water supply was economically, practicably and compulsorily necessary in order that both Naval and civilian water needs might be adequately subserved and the whole water emergency completely overcome. This coöperation was thereupon negotiated, accepted and engaged by and between the following governmental agencies, each thus achieving for itself and for all concerned the best, most economical and efficient means for obtaining a fully adequate water supply:

A. The United States of America (by and through the United States Navy Department), sup-

plying two-thirds of the cost of the joint supply facility, but thus obtaining a quadruplication of gross water supply capacity that could be made available with the $2,000,000 appropriation alone (the added capacity being needed as a cushion of safety for defense emergencies) and a minimization of cost of production and operation;

B. THE FLORIDA KEYS AQUEDUCT COMMISSION, supplying one-third of the cost of the combined pipe line, and thus also obtaining for its civilian consumers more than a quadruplication of gross water supply capacity which could be made available to it on its own financing abilities, and besides, receiving the protection and security of the facilities through the Naval Forces of the United States as well as a minimization of cost of construction and operations;

C. CITY OF KEY WEST: leasing its uncompleted, inadequate and unusable distribution system (placed there without cost to the City by the Federal Emergency Relief Administration with Federal funds as a relief works), thus obtaining immediately, and without taxation or debt, fully adequate water supply and distribution facilities for its population at controlled cost rates, and the eventual reversion to the City, upon the expiration of the Lease, free and clear of all debts, of a complete fresh water system in operation and in good order.

It is to be noted that the City of Key West itself has no financial means to do anything to obtain a water supply or to complete and extend the distribution system to take advantage of a water supply, even if one were available.

In the tri-partite coöperation between the Federal, State and Municipal Agencies to solve such a critical,

vital emergency which menaced the public welfare within the scope of their respective functions, there was also invoked the Federal financial aid of

D. THE RECONSTRUCTION FINANCE CORPORATION, to furnish immediate means to provide funds for the Florida Keys Aqueduct Commission not only to achieve the larger water supply capacity for the civilian population of the area, but also to construct the needed distribution system on the Florida Keys, as well as to complete, extend and put into utilitarian use the desuetudinous distribution system which had been gratuitously placed in the City of Key West by the United States Government as a relief work.

The financing engaged by the Florida Keys Aqueduct Commission from the Reconstruction Finance Corporation was by way of selling to it $1,500,000, 4% water revenue bonds, in amount estimated sufficient to accomplish the above mentioned purposes. It is an evident *sine qua non* that the Reconstruction Finance Corporation had, to the financially sagacious satisfaction of its officials and directorate, determined that the Florida Aqueduct Commission and its relation to the whole project presented a financially feasible and secure self-liquidating government-owned and controlled public utility, and that the public water consumption potentials were ample to assure the Bond Issuer's ability to maintain debt and operation charges and to amortize the financing in the usual periods of maturities of such Revenue Bond Issues.

In pursuance of this necessary and mutually beneficial coöperation between these governmental agencies (and to meet the prerequirements of the Reconstruction Finance Corporation) the Florida Keys Aqueduct Commission entered into agreements; one with the

United States of America, acting by the Secretary of the Navy, and one with the City of Key West.

The time required for the formulation, elaboration and definitive adoption of prerequisite engineering, legal and interdepartmental details of the project, permitted original estimates of costs to be overtaken by rises in labor and material markets, largely occasioned by priority restrictions for National Defense.

The original estimate of $3,000,000 for the large supply pipe line was increased to $3,375,000, the Navy to supply (two-thirds) $2,250,000, and the Florida Keys Aqueduct Commission (one-third) $1,125,000. The Congressional appropriation of $2,000,000 for the Navy was supplemented by the Secretary of the Navy from a contingency fund provided to meet deficiencies in costs of defense projects. The Florida Keys Aqueduct Commission safe-guarded against this cost increase contingency by arranging with the Reconstruction Finance Corporation to provide for a Revenue of Bond Issue of $1,750,000; $1,125,000, as one-third of the Florida Keys Aqueduct Commission's cost of the larger capacity supply pipe line, and $375,000 estimated cost of constructing distribution systems on the Florida Keys and completing and extending the distribution system in Key West, and $250,000 to be sold and the proceeds used only with the approval of the Reconstruction Finance Corporation and the Bond Trustee, if and as increased costs contingencies should develop to require it.

In addition to the Congressional sanction, there was State Legislative authorization for the tripartite coöperation and its required financing for the Florida Keys Aqueduct Commission phase thereof. The Florida State Legislature, in its 1941 Regular Session,

passed House Bills 1498 and 1499, respectively, *in pari materia.*

House Bill 1498 amplified and made specific some of the general powers already granted the Florida Keys Aqueduct Commission by c. 18350, Acts of Florida, 1937; in particular and expressly the arrangement with the Navy, the Lease of the Distribution System in Key West, and the financing structure of the self-liquidating Revenue Bonds to be sold to the Reconstruction Finance Corporation.

House Bill 1499 expressly authorized the City of Key West to enter into the Lease arrangement with the Florida Keys Aqueduct Commission.

It is noteworthy that the original Act creating the Florida Keys Aqueduct Commission (c. 18530, Acts of Florida 1937), and the subsequent Enabling Act, House Bill 1498, *supra,* expressly empowering and authorizing the Florida Keys Aqueduct Commission, both specifically exclude these Revenue Bonds of the Commission from those classes of bonds which, by the Constitution of Florida, are inhibited except to repel invasion or which depend upon prior approval of the affected electorate because payable directly or indirectly through taxation.

The Creative Act, (c. 18530, Acts of Florida, 1937), permits the Florida Keys Aqueduct Commission ". . . to own, buy, sell, lease property . . . to borrow money for the construction and maintenance of such water supply and distribution system from the Federal Government or other financial Agencies, and to secure repayment of such money by pledging the physical assets and the revenue deprived from such system; *provided, however, that at no time shall the Board have the power of levying taxes on any person or*

*property, nor shall any act of said Commission be* deemed to pledge or involve the faith and credit of the *governmental subdivisions which may lie in the district of or be served by the Commission."*

The Enabling Act (House Bill 1498) which specifically and expressly provides for the coöperation and this particular financing structure, provides:

"Section 5. No Power to Levy Taxes.—Water revenue bonds issued under the provisions of this Act shall not be deemed to a debt of the State or of any municipality or county therein or a pledge of the faith and credit of the State or of any such municipality or county, but such bonds shall be payable solely from the funds hereinafter provided therefor from water revenues. All such bonds shall contain a statement on their face to the effect that there is no obligation to pay the same or the interest thereon except from water revenues, and that there are not pledged to the payment of the principal or interest of such bonds the faith and credit of the State or of any municipality, or county in the State. No holder of any of the bonds shall ever have the right to compel any exercise of the taxing power on the part of the Commission or any municipality or county or any other agency possessing the taxing power, to pay any such bonds or the interest thereon, nor to enforce payment thereof against any property of the Commission or of any municipality or county in the State, nor shall any such bonds constitute a charge, lien or encumbrance, legal or equitable upon any property of the Commission, or of any municipality or county in the State." (Section 5, House Bill 1498).

It will be noted also that the formal documents governing the financial features and the accountancy

mechanics of the proposed Bond Issue of the Commission also expressly negative, in unequivocal terms, any possibility of pledge of the faith and credit of any State or municipal agency.

The Trust Indenture (Sec. 5) provides:

"Nothing in the bonds or coupons or in this Indenture shall be construed as pledging the faith and credit of the State of Florida or as creating any debt of any municipality or county in said State."

The form of the proposed Water Revenue Bonds (which is also set forth in the Trust Indenture) accordingly provides:

"This bond shall be payable exclusively from the special fund provided therefor from water revenues and there is no obligation to pay the same or the interest thereon except from such revenues. There are not pledged to the payment of the principal or interest of this bond the faith and credit of the State of Florida or of any municipality or county therein. The issuance of this bond shall not directly or indirectly or contingently obligate the Commission or the State or any county or municipality therein to levy or to pledge any form of taxation whatever for the payment of this bond."

In fact, there is no pledge even of the physical assets of the Commission. The bonds are *solely* payable from and secured by special fund created out of the revenues derived by the Commission from the sale of water as a public utility serving the consumer-public in its area: and this was shown to be deemed sufficient by the Reconstruction Finance Corporation, and shown to be so by the engineering surveys.

The United States Navy, in reliance upon the Agreement, perfected the plants and specifications for the

larger capacity water supply pipe line, and received bids for the materials and labor required for the project. The larger dimension conduit pipe was ordered, in the amount of $1,421.023. The Navy has already spent or become obligated for a total sum of $2,084,781 for the various operations connected with the Key West water supply line.

In furtherance of the plan, House Bill No. 1499 was passed at the regular session of the Florida Legislature of 1941 and approved by the Governor on May 26, 1941, and authorizes the City of Key West, Florida, to lease its existing water distribution system to the Commission. The City has leased its existing water distribution system to the Commission.

Under the Agreement the Department agrees to supply to the Commission in bulk, at all times, throughout the terms of the Agreement at least one-third of the total quantity of water available in each twenty-four hours from the pipe line aqueduct when operated under normally designed conditions. The Department will build, own and operate the pipe line. The Agreement sets forth the terms and conditions upon which water is to be supplied to the Commission and withdrawn from the pipe line aqueduct.

Under the terms of the Agreement the Commission is to reimburse the Department for the Commission's proportionate share of the cost of operation, main-tenance and non-major repairs of the water supply system and is to make such reimbursements quarter-annually upon receipt of bills therefor. But all such sums are to be treated as a part of the Commission's expense of operation and are to be included by the Commission in its budget of costs of operation, maintenance, repair and replacement of the water distri-

bution system. Such costs are part of the cost of furnishing water to the consumers of the Commission and are payable solely out of the revenues from the sale of water by the Commission to the consumers thereof.

Under the provisions of the Lease by the Commission of the Existing Distribution System of the City of Key West, Florida, it is provided:

"In the event that the City shall avail itself of the facilities or services rendered by the water utility services of THE COMMISSION, all sums of amounts duly charged by THE COMMISSION and accumulated during the previously quarterly or semi-annual period for fire hydrant rental and for water consumed by THE CITY shall be paid for as such charges accrue; but nothing herein shall be construed as requiring THE CITY to avail itself of the facilities or services rendered by the water utility services of THE COMMISSION."

We are asked to adjudicate the following questions:

"1. Does the testimony and exhibits taken and introduced at the trial of the cause sustain the Court's findings of fact, or any of them?

"2. Is House Bill No. 1498, passed at the regular Session of the Florida Legislature of 1941 and approved by the Governor on May 26, 1941, a constitutional enactment?

"3. Is House Bill No. 1499, passed at the regular Session of the Florida Legsilature of 1941 and approved by the Governor on May 26, 1941, a constitutional enactment?

"4. Will the issuance of the proposed Water Revenue Bonds under the provisions of the Commission's

Resolution No. 23 and the Trust Indenture authorized thereby violate the provisions of Amended Sec. 6 of Art. IX of the Florida Constitution in the absence of the approval of the issuance of such Bonds by a majority of the votes cast in an election in which a majority of the free-holders who were qualified electors residing in the territory to be served by the waterworks system as defined in said Trust Indenture or residing in the County of Monroe or in the County of Dade participated, or in any election whatsoever?

"5. Does the Agreement between the Commission and the Navy Department of the United States of America provide for an unlawful donation of funds, and also violate the provisions of Section 10 of Article IX of the Florida Constitution?

"6. Does the lease between the Commission and the City of Key West, Florida, violate the provisions of Section 10 of Article IX of the Florida Constitution?

"7. Is the lease between the Commission and the City of Key West, Florida, void because of the lack of approval thereof by a majority of the votes cast in an election in which a majority of the freeholders who were qualified electors residing in the City of Key West, Florida, participated as required by Amended Section 6 of Article IX of the Florida Constitution?

"8. Does the Aqueduct Commission have authority to assign its interest in the 'Agreement' or in the 'Lease' as security for the payment of its Revenue Bonds in the manner provided and set forth in the 'Trust Indenture'?

"9. The Florida Keys Aqueduct Commission is a body corporate and politic of the State of Florida,

owning no property whatsoever, and having no power to levy or collect taxes and no income Revenue whatsoever at the present time: Under these circumstances, does the 'NAVY CONTRACT' and the 'CITY OF KEY WEST LEASE' and the 'PROPOSED TRUST INDENTURE' and the 'PROPOSED REVENUE BONDS' constitute an unlawful and unconstitutional scheme or device whereby bonds are issued for the purpose of providing a water supply for the CITY OF KEY WEST and the UNITED STATES NAVY DEPARTMENT, and pledging as security for the payment of the bonds, the possession, control and management of the waterworks system owned by the CITY OF KEY WEST without any referendum or election on the issuance of the Bonds or the pledging of the waterworks system as is required by law, and the unlawful donation of the proceeds of the Bonds, or the major portion thereof, to the NAVY DEPARTMENT, all in violation of Sections 6, 7 and 10 of Article IX of the Constitution of the State of Florida?"

The plan which is presented here is in many respects different from any which we have heretofore had under consideration and, therefore, we have deemed it expedient to outline just what is reflected in the record. It appears that practically every legal question presented has heretofore been considered and adjudicated by us in some of the many opinions which we have handed down in cases involving bond issues in behalf of self liquidating projects.

No tax levying power is proposed to be exercised by the Commission and no taxing unit is in any way responsible for the payment of the bonds or interest thereon. We might say this is a sufficient answer to all contentions of appellant but, as this is a matter

of great interest to the public within the affected area, as well as the National defense, we shall briefly discuss the several questions as they are presented.

As to the first question we may say that there is ample substantial evidence in the record to support each and every of the findings of facts for the chancellor and no showing of abuse of discretion is found in the record.

On appeal the burden of showing error rests upon the party asserting error. See State v. Hillsborough County, 132 Fla. 832, 182 Sou. 269; State v. City of Clermont, 143 Fla. 434, 196 Sou. 850.

Under question 2 of the appellant in its argument has posed three propositions, as follows:

"(a) That House Bill No. 1498 authorizes the issuance of 'Bonds in violation of the limitations set forth in amended Section 6 of Article IX of the Florida Constitution, and without requirement for the approval of such Bonds by a majority of the votes cast in an election in which a majority of the freeholders who were electors residing in the territory affected or residing in the County of Monroe or in the County of Dade, had participated.'

"(b) That said House Bill and said Trust Indenture, proposed to be issued as security for the Water Revenue Bonds, provide for a pledge of the Rate Making Power of the Commission; that such a pledge constitutes a debt in violation of Section 6, Article IX of the Constitution, since there is no provision for a ratification or approval by the freeholders.

"(c) That House Bill No. 1498 was passed in violation of, and not in conformity with, amended Section 21 of Article III of the Florida Constitution requiring

the fact of notice of intention to apply for the passage thereof to be established in the Legislature and recited in the Journals of the House and Senate, since the Journal of the Senate showing the introduction of House Bill No. 1498, contains only the statement 'proof of publication attached', as a part of the message from the House of Representatives reporting the passage of House Bill No. 1498 by the House."

The propositions contained in paragraphs (a) and (b) *supra* are not tenable because there is no power of taxation involved in this case. In this case the Florida Keys Aqueduct Commission is a body corporate and politic. It is a public Agency of the State of Florida. See c. 18530, Acts of 1937, and House Bill No. 1498, Acts of 1941. There is not created any lien or encumbrance, legal or equitable, upon any property of the Commission or upon any property of any municipality or of any taxing unit of the State. Under the terms of the Acts of the Legislature, *supra*, and of the Water Revenue Bonds proposed to be issued, and of the Trust Agreement, all principal and interest are payable solely from water revenues. In many respects the legal principles involved here are the same as those which were involved in the case of State v. Dade County, 146 Fla. 331, 200 Sou. 847, and in Kimsey v. Walton County Bridge Authority, et al., 136 Fla. 204, 186 Sou. 418. In both those cases the bond issues were validated. The fact that this is a tri-party undertaking does not vitiate it, and will not affect the validity of the bonds. In this respect it is not unlike the question presented in State v. Gordon, 138 Fla. 312, 189 Sou. 437. In that case we held:

"Section 5 of Article IX of the Constitution, among other things, limits the assessment and collection

of taxes in Counties and Municipalities to county and municipal purposes. Relator contends that House Bill 1145 violates this command. This Court has repeatedly held that the Legislature may be the judge of what constitutes a county or municipal purpose and that such purposes frequently overlap; in other words, an object or function may be both county and municipal in purpose.

"By the same token, a governmental project may respond to a municipal, county, state or federal purpose or all may coalesce in the same project but that fact does not inhibit the County, State or the Federal Government, any one, or all, of them from contributing to it. This Court takes judicial knowledge of the fact that the expenditure of many millions of dollars for a defense project in a locality or county such as we are here concerned with will redound in material values to Duval County and the State of Florida. The fact that the product of the expenditure is a great defense medium for the Federal Government is no bar to the State and the County contributing to it when it results in material development in which they are the beneficiaries. Stockton v. Powell, 29 Fla. 1, 10 So. 688, 15 L.R.A. 42; Board of Commissioners of Escambia County v. Board of Pilot Commissioners of Port of Pensacola, 52 Fla. 197, 42 So. 697, 120 Am. St. Rep. 196; State v. Clausen, *supra*; Merrick v. Inhabitants of Amherst, 12 Allen 500, 94 Mass. 500."

The proposition contained in paragraph (c) is not supported by the record. The excerpts from the House Journal of its proceedings of May 22, 1941, show the introduction of House Bill 1498 by Mr. Papy of Monroe. The record shows that there was attached to the bill as introduced, proof of publication of notice

and the Journal shows that immediately following the record of the introduction of the bill "the House of Representatives thereupon determined that the notice and evidence thereof required by Sec. 21, Art. III of the Constitution has been established in this Legislature." The Journal of the Senate of May 23, 1941, shows that the Senate received the mesage from the House of Representatives informing the Senate that the House of Representatives had passed House Bill 1498. The message set forth the title in full and stated "proof of publication attached." The question presented here was determined by us in the case of State v. Couch, 139 Fla. 353, 190 Sou. 723. The only difference between this case and that case is that there the bill was introduced in the Senate with proof of publication and after passage was transmitted to the House, while in this case the bill was introduced in the House with proof of publication and after passage was transmitted to the Senate.

As heretofore stated, the Act is not in violation of amended Sec. 6 of Art. IX in authorizing bonds to be issued without the vote of freeholders because the proposed and authorized bonds are not issued or to be issued by a taxing unit.

Under question 3 it is contended that the lease between the Commission and the City of Key West as to the distribution system now existing in Key West constitutes a bond. We do not agree with this contention.

The Water Revenue Bonds and Trust Indenture are to be executed and entered into in subordination to the provisions of the applicable statutes cited, *supra*. The lease of the City property to the Commission is simply a means to an end, that is to provide

the means by which the City may be supplied with adequate water for the municipal use and the use of its citizens.

A similar provision was before us in the case of Board of County Commissioners of Pinellas County v. Herrick, 123 Fla. 619, 167 Sou. 386. In that case Water Revenue Certificates were upheld and validated.

The third question may be disposed of by reference to what we have said in regard to the second question.

In answer to the fourth question we hold that Amended Sec. 6 of Art. IX of the Florida Constitution is not violated by the issuance of the Water Revenue Bonds or the Trust Indenture. See authorities heretofore cited and State v. City of Miami, 146 Fla. 266, 200 Sou. 535. We might also cite cases from foreign jurisdictions but the cases to which we have referred are controlling in this jurisdiction.

Under the fifth question it is contended that the agreement between the Commission, the Navy Department and the United State of America constitutes a violation of Sec. 10, Art. IX of the Constitution in that it contemplates a lending of the credit of the State or the City of Key West to the Commission and to the U. S. Government, which is a corporation within the meaning of the constitutional prohibition. Appellant cites the dissenting opinion of Mr. Justice BROWN in the case of Lott, *et vir* v. City of Orlando, *et al.,* 142 Fla. 338, 196 Sou. 313, as supporting the contention. First, we may say that a dissenting opinion not concurred in by a majority of the Court is no authority for the enunciations contained therein. Reference to the majority opinion in that case does not sustain the contention of the appellant.

The record does not show the pledging or loaning

of credit of the State or of the municipality to any individual company, corporation or association. At most, it shows only that the municipality has leased its distribution system to the Commission in order that the Commission may use that system with the improvements and additions which will be made thereto for the purpose of supplying adequate water for the municipality and for other necessary purposes. The title to the existing system is not affected either by transfer or lien.

The record also shows that when the Commission shall have discharged the obligations which it incurs in providing the water system together with the improvements and additions to the distribution system the distribution system will become the property of the municipality free of all liens and without cost to the tax-payers and it may be said parenthetically here that the distribution system which the City now owns was acquired by the City at very little, if any, cost to the tax payers. If there is any element of loaning of credit involved, the Commission is loaning its credit to the Municipality of Key West to provide for it an adequate water supply and distribution and without any security except the earnings of the system and those earnings are adequately safe-guarded by the application of rate making power conferred by the statutes, *supra*.

Question six is based upon the erroneous hypothesis that the lease contract constitutes a bond, which contention we have heretofore disposed of on authority of Bailey v. City of Tampa, *supra*, and State v. Gordon, *supra*.

The seventh question may be likewise disposed of for the reasons stated. The lease contract does not

constitute a bond and no tax power is pledged for the payment of anything in connection with this undertaking. The lease creates no debt on the part of the City, nor is there any obligation on the part of the City to subscribe for to be furnished or to pay for any water supply, except that for which the City may see fit to contract.

In the case of Leon County v. State, 122 Fla. 505, 165 Sou. 666, we held:

"The purpose of Amended Section 6 of Article IX of the Constitution was to impose a constitutional limitation on county, district and municipal financial operations insofar as the same might involve any form of direct or indirect contractual obligations of anticipated future tax revenues to presently *raise funds* for county, municipal or district purposes that would have to be repaid *in futuro,* with interest, to the parties advancing same in anticipation of a redemption of the contractual obligation so incurred. The limitation so imposed must be construed to mean that no financial obligation in the form of a present funding of future tax anticipations shall be made, whether general or limited, direct or contingent in form, unless the asumption of the obligation of same be first approved by a favorable vote of a majority of the county, municipal or district freeholders as provided for in said constitutional section and article. But the constitutional provision evidenced by Sec. 6 of Art. IX was not to hamper the ordinary powers of public authorities to enter into binding service or construction *contracts* for current governmental needs and requirements, such as the erection or repair of essential public edifices and the like, when done in due

course of their authorized budgetary administration of. public affairs."

The eighth contention is likewise based on the erroneous hypothesis that the lease contract constitutes a bond. We think it is unnecessary to repeat what we have heretofore said in this regard.

The ninth question presents practically a restatement of the former contentions and, upon consideration thereof, we hold the same to be without merit. Some of the same contentions presented here were presented in the case of Brash v. State Tuberculosis Board, 124 Fla. 652, 169 Sou. 218, and were there overruled.

For the reasons stated, the decree should be affirmed and it is so ordered.

Affirmed.

BROWN, C. J., WHITFIELD, TERRELL, CHAPMAN, THOMAS and ADAMS, J. J., concur.